## THOMAS R. BROWN ET AL. *vs.* THE RASIN MON-UMENTAL CO.

*Contract Providing for Forfeiture if Work be Suspended for Ten Days —Sundays not Included in the Computation—Act of the Other Party Preventing Performance of Contract at Time Stipulated.*

A contract provided that one of the parties should do certain work continuously, and that if he should at any time suspend such work for ten days then the other party should have a right to terminate the agreement. *Held*, that Sundays are not to be included in the computation of the ten days, since the suspension prohibited was that of work on days when there was an obligation to work and not on Sundays when no work was contemplated.

When a contract gives to one party a right to declare a forfeiture in case the other party fails to do a certain thing by a given time, and the doing of that thing requires a concurrent act by the former party, then such party is not authorized to declare a forfeiture when the failure to perform in due time was owing in part to his own unreadiness to do the concurrent act.

The contract between plaintiff and the defendant company provided that the plaintiff should remove tar from a pond on defendant's land to be worked up in a plant to be there erected. It was stipulated that upon completion of the plant the plaintiff should begin and thereafter continuously remove the tar from said pond, and that in case he should at any time suspend for ten days the work of removing the tar from the pond or the performance of any other condition of the contract then the defendant should have the right to terminate the agreement and re-enter upon the premises and hold the same, together with the improvements placed thereon. The contract further provided that weights were to be taken by the defendant as the tar was removed from the pond. The defendant did not in practice allow any tar to be taken away until it had been weighed. On December 12th the plaintiff took out certain tar which filled his receiving tanks, so that there was no place to put any more. When the tanks were emptied on December 19th, it was found that certain repairs to them were necessary. These were finished on December 24th, no tar having been taken from the pond in the meanwhile. At 2 o'clock in the afternooon of the last-named day, plaintiff's manager endeavored to remove tar from the pond but upon going to defendant's office found that there was no one present author-

ized to weigh the tar and that the office force had left for the day.  Consequently no tar was then taken out: Soon afterwards the defendant notified plaintiff that the contract was rescinded on account of the latter's failure to remove any tar for ten days.  Plaintiff then filed the bill in this case asking that the defendant be enjoined from interfering with plaintiff's right to remove the tar and otherwise to· carry out the contract.  *Held*, that, since Sundays should be excluded in the computation of the ten days mentioned in the contract, the plaintiff was not in default on December 24th, that being the last of the ten days allowed; that the plaintiff attempted in good faith to do the work on that day but was prevented from doing it on account of the absence of defendant's agents who were to do the weighing, and that therefore the defendant was not authorized to declare the contract forfeited on the ground that the plaintiff had suspended for ten days the work of removing tar from the pond.

*Semble* that by the true construction of this contract the right of the defendant to declare a forfeiture does not depend upon a mere failure to remove tar from the pond for ten days, but upon a suspension for ten days of all work, including the treatment of the tar in the tanks as well as the digging it out of the pond.

Appeal from a decree of the Circuit Court of Baltimore City (HARLAN, C. J.)

The cause was argued before MCSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE and SCHMUCKER, JJ.

*Bernard Carter* and *Edgar Allan Poe*, for the appellants.

*Randolph Barton* and *James M. Ambler*, for the appellee.

BOYD, J., delivered the opinion of the Court.

This is an appeal from a decree dissolving an injunction issued at the instance of the appellants against the appellee, and dismissing the bill.   The appellee entered into an agreement with Messrs. Brown and Butcher, by which it authorized them to remove and sell the tar in a pond on its premises in Anne Arundel County.   Messrs. Brown and Butcher subsequently assigned their interest in the agreement to the Impervious Product Company of West Virginia, with the consent of the appellee.   The injunction restrained the appellee from interfering with the appellants entering on the premises of the appellee and removing therefrom the tar from the pond and

from hindering them in any way from exercising their rights under the contract.

The appellee answered alleging that the appellants had failed to perform their part of the contract and admitting they had notified them not to remove any of the tar and that it proposed to assert its rights under the contract. In order that the points in controversy may be better understood, we will quote in full the second and seventh paragraphs of the agreement, as they are particularly involved. They are: "Second. The parties of the second part (Brown and Butcher) shall without delay erect and within forty days complete a plant to work up the said tar, and as soon as said plant is completed, begin and thereafter diligently and continuously remove the tar from said pond. * * * * * * * * Seventh. In case the parties of the second part shall fail to complete said plant within forty days, as above provided, *or shall at any time suspend for ten days the work of removing said tar from pond* or shall fail to make payment in full of any accounts when due, as above provided, or to observe or perform any other condition, or undertaking on their part herein, then the party of the first part shall have the right, without further notice, to terminate this agreement and to re-enter upon said premises and hold the same together with any buildings or improvements made or placed there by parties of the second part, as if this agreement had not been made."

It is admitted that no tar was actually removed from the pond after December 12th, 1902, before this injunction was issued (January 5th, 1903), but the appellants contend that they were ready to remove some on December 24th, but were prevented by the appellee's failure to have some one weigh it, and it is admitted that they attempted to do so on December 26th, but were prevented by the appellee. The default on the part of the appellants relied on by the appellee is their alleged suspension for ten days of the work of removing tar from the pond.

1. As there were two Sundays between December 12th and 24th it will be well to determine at once whether they are to

be included in the ten days, for if they are it will be useless to examine the evidence to ascertain what was done on the 24th of that month.  In *American Tobacco Company* v. *Strickling*, 88 Md. 500, we held that when a statute provides that an act shall be done within a certain number of days exceeding seven, the general rule is that Sundays will be included in computing the time, but after quoting from the Encyclopedia of Law to that effect, we said, "Of course that rule will not apply when Sundays are expressly excluded by the statute, or the intention of the Legislature to exclude them is manifest." In construing written contracts it is proper to look at the whole instrument to ascertain the sense in which words or expressions are used, and if we there find the intention of the parties to give a particular meaning to them that should as far as possible be adopted.   Sunday is "a day" and therefore may be one of "ten days," but the question is whether the "ten days" mentioned in this agreement include the kind of a day Sunday is, and in order to do that we must bear in mind the connection in which that term is used.   When the plant was completed, the appellants were at once to "begin and thereafter diligently and *continuously* remove the tar from said pond."   It cannot be contended that it was contemplated by the parties, in the use of those terms, that the appellants should work on Sundays.   To do so unnecessarily would be a violation of the statute law of the State, and hence it cannot be presumed that the parties so intended.   When then a forfeiture of their property was authorized if the appellants "shall at any time suspend for ten days the work of removing said tar from pond," the parties manifestly referred to the kind of days when the appellants ought to be engaged in removing tar— that is to say, *working days*.   They could not have meant that the appellants would be liable to the forfeiture if they suspended work on the days it was known, and must be presumed to have been understood, that *it was to be suspended*.   The suspension prohibited was on the days they were under obligation to work, and not on those on which no work was contemplated.   There is no provision in the agreement that indi-

cates that the parties had any other intention in the use of this term.   In the sixth paragraph they provided for payment "on or before the tenth day of each and every month," but there is only one "tenth day" of each month, and there could be no question about what they there meant.   If there be any doubt about the meaning of the expression under consideration and to suspend ten days must result in forfeiture, which is never favored in equity, it would be proper to resolve the doubt against the party seeking to enforce it, as far as the language of the parties and the principles of the law permit. As there were two Sundays between the 12th and the 24th of December, we are of the opinion that the appellants could have avoided the forfeiture by removing tar from the pond on the 24th—it being conceded that they did work on the 12th.

2. The next inquiry is, did they save a forfeiture by what they did, or were ready to do, on that day?   It must be admitted that the appellants had not, up to this time, done very much in the way of removing the tar, as they had only taken out three hundred and ninety-seven tons from the time they started on September 3rd, 1901, to December 24th, 1902, but it is evident that both parties regarded the enterprise as somewhat of an experiment.   Mr. Doggett, the general manager of the Impervious Product Company, testified that it was a new thing, that there was no demand for this particular product and their competitors "tried to decry the character and quality of it and interfered with us in making a market for it." The tar had been on the property of the Rasin Company for eighteen or twenty years without profit or use to it during that time, and the conditions inserted in the agreement, together with the parol testimony, show that the representative of that company was doubtful about the success of the enterprise. The appellants agreed to pay the Rasin Company three dollars per ton for the tar taken out, and two hundred and fifty dollars per annum for the use of its property.   They paid it "for tar, rental, and for the use of their cars and other articles, somewhere in the neighborhood of $2,700."   The appellants had expended about $25,000 in their plant, and in

carrying on and developing the business. The plant con-
sisted of two receiving tanks, a finishing tank, a one-story
brick building, sixty-five by thirty feet, a warehouse, a boiler,
a small engine and some other property. The tar is dug out
of the pond, placed in small cars and emptied into the receiv-
ing tanks. It remains in them "a sufficient length of time
under the action of heat to liquify it," so that it can be treated
with lime to neutralize the acid in it, and when that is done
it is pumped into the upper or finishing tank. The testimony
shows that the process takes two or three days to treat it in
the receiving tanks, and five or six in the finishing tank—the
time varying somewhat according to circumstances. When
the receiving tanks were full, there was no place to put the
tar, unless it was dumped on the ground, which would not
only add to the expense, but would be unsatisfactory in other
respects. There are coils of pipe in the tanks which have to
be repaired from time to time, and which can only be done
when the tanks are empty. There is no provision in the
agreement requiring the appellants to take out any stated
quantity per day, month or year. Mr. Doggett said he ex-
plained fully to Mr. Crenshaw, the representative of the Rasin
Company, before the contract was executed, the method they
proposed to follow, and as the plant was erected on the prem-
ises of that company, its size and capacity were of course
known to him. It was not completed within the time agreed
upon, but the Rasin Company did not take advantage of that,
and acted with leniency towards the appellants during the first
year the plant was in operation. Mr. Doggett testified that
the prospects of the success of the enterprise had improved
and that his company was arranging for larger facilities when
the appellee attempted to terminate the contract. He swore
that an offer of thirty-five thousand dollars was made in the
presence of Mr. Crenshaw, for their plant and business,
although he admitted it was to be paid "on the installment
plan, so much on every ton worked up in the plant."

On December 13th the tanks were full and the tar in them
was not finished until the 19th. When it was taken out it

was found that the tanks were out of repair, some of the pipes had been injured by the acid and there were a number of breaks.   They began to make the repairs on the 20th, and they worked on them constantly, Sunday included, until about two o'clock on the 24th, when they finished them.   Although no tar had been removed from the pond since the 12th of the month, the hands were kept regularly employed in work of some kind about the plant, and worked the morning of the 24th.   When the men left for dinner, the foreman, James Sanders, told them to come back in the afternoon to dig tar, and two of them came for that purpose.   Mr. Doggett got to the works about two or three o'clock, and told the foreman to have tar dug and resume operations, but he said the Rasin Company had given its men half holiday and there was no one to do the weighing.   The contract provides: *"weights to be taken by the party of the first part, as the tar is removed from the pond,"* and Mr. Doggett testified "they notified us not to remove any tar until we have given notice to the office so that it should be weighed before removed."   That is not contradicted, and much of the testimony in the record is on the question whether there was any one present to take the weights and whether there was really any *bona fide* effort to start that afternoon.   Mr. Doggett did not rest on the information he had received that there was no one there to weigh the tar, but he and Sanders both swore that they went to the office of the Rasin Company to ascertain whether there was, but could find no one there, and were informed by some of the men in the "fire room" that those in the office had gone home, as the Company had allowed them to go, to do some shopping for Christmas.   Logan Flannigan, who was one of the men who went back to dig tar that afternoon, testified that he saw Messrs Doggett and Sanders go that way, but he did not go with them to see whether they went to the works of the Rasin Company.   Unless those two witnesses deliberately perjured themselves, there can be no doubt they went to the office of the Rasin Company to ascertain whether there was any one to weigh the tar, and found no one.   Mr. Nash, the superinten-

dent of the Rasin Company, testified that he left the office at two o'clock, Mr. Bosman, a clerk of the company, said he was at the office until two o'clock, Mr. Weihrauch, another clerk, said "he was in the office until one o'clock, and then came back again at half-past two, and stayed there about fifteen minutes, and went out again, and came back fifteen minutes after four." Mr. Doggett said the two firemen in the employ of the Rasin Company, whom he and Sanders found, were named "McQueen and Spencer." The latter was not called as a witness, but a man whose name is given in the record as "Voncullen" testified that Doggett did not ask him if there was any one to take the weights, but he said Doggett was talking with Spencer, although he did not hear the conversation. The only other witness who was put on the stand to show that Doggett and Sanders did not go to the office that afternoon made some broad assertions about it, but his testimony is too self-contradictory and uncertain to authorize us to accept his statement as sufficient to overcome the evidence of the appellants. According to Mr. Nash, those who had previously weighed the tar were Essex, Weihrauch, Bosman and himself. Essex was not put on the stand and we have already seen that the others were not in the office after two o'clock, excepting Weihrauch, and he was not there much that afternoon, being engaged at work three hundred yards from the office. There was one other man that Mr. Nash said was authorized by him to take the weights, but it is not caimed in the testimony that he ever did so, or that the appellairs had any knowledge that he was so authorized, and he was not at the office when Doggett and Sanders called. There was no real contradiction of Doggett and Sanders about their going to the office of the Rasin Company, as can be seen from the evidence above stated, and the great preponderance of the testimony shows that they were informed that those accustomed to weigh the tar had gone, as the superintendent of the company himself admits he had. They both swore that they were ready and anxious to get out tar that afternoon, and had two men there ready to do the work, who could have gotten out

one or two car loads, and in that they were corroborated by those men.    It was the day before Christmas, which probably accounted for the absence of those usually about the office, and the testimony shows that although there were some men engaged in loading a boat with fertilizer and probably some doing other work, those who had been in the habit of weighing the cars were undoubtedly absent from the office throughout the afternoon after two o'clock, excepting Weihrauch, who was only there occasionally.    Having been notified not to remove any tar until notice was given at the office, and having agreed that the weights were to be taken as the tar was removed from the pond, Doggett naturally and properly hesitated to do so.    It is true they might have filled the cars and let them remain at the pond until they were weighed, but it would not have been in accordance with the terms of the agreement, certainly not as construed by the defendant.    That would perhaps have been the best plan to have pursued, although if it be true that those whose duty it was to weigh the tar had gone, it would have seemed a useless proceeding to load the cars which would doubtless have had to remain loaded until the day after Christmas.

The question then is whether the appellee was entitled to declare the contract forfeited under this clause, when the facts established by the testimony are such as we have stated. After being engaged for several days in making repairs, which were necessary and are to be expected in any business of this character, the appellants finally completed them on the last of the ten days allowed by the contract, and attempted in good faith, as we believe from the evidence, to have work done, but through no fault of theirs they were unable to do so on account of the absence of the appellee's agents to do the weighing. Under such circumstances we are of the opinion that a Court of equity should not permit the party asserting and seeking to take advantage of a forfeiture to do so.    It was said by CHANCELLOR KENT in *Livingston* v. *Tompkins*, 4 Johns. Chan. 431, that "It may be laid down as a fundamental doctrine of the Court, that equity does not assist the recovery of a penalty

or a forfeiture," and in 2 *Story's Eq. Juris.*, sec. 1319, that "It is a universal rule in equity, never to enforce either a penalty or a forfeiture"—both of which are cited in *Cross* v. *McClenahan,* 54 Md. 24. We are of course aware that there is a distinction between giving the active, affirmative aid of a Court of equity to declare a forfeiture, and simply recognizing that a forfeiture has taken place, under a · contract made between the parties which the Court must recognize and be controlled by. But a Court of equity can, and ought to, require a party claiming the benefit of a forfeiture such as this to do his full duty, and not in any way be responsible for the failure of the other party to strictly comply with the contract before he should be permitted to assert it. There is nothing in this agreement requiring the appellants to remove a given amount of tar per day, and if they had only taken out one car load on the 24th, and were prevented from taking more by reason of being engaged in necessary repairs, it would have been a technical compliance with this provision, and inasmuch as they were then ready to take it, and were only prevented because the appellee's agent was not there to do its part—weigh the tar—the appellants must be considered as having done what they were ready and willing to do.

We have not thus far questioned the construction placed on this .clause by the appellees, excepting as to whether Sundays are to be included in the ten days, as we are of the opinion that the testimony sustains the appellant's contention as to what was done on the 24th, and that being so we have no doubt as to the duty of a Court of equity in the premises. But without basing our conclusion on it, we think there is force in the position taken by the appellants that this clause did not contemplate simply a failure on their part to dig tar for ten days. When the contract speaks of suspending "the work of removing said tar from said pond," it may well be questioned whether the parties intended to confine that to the mere digging of the tar out of the pond, or whether it did not have reference to *the work* in which the appellants were engaged—including the manufacture as well

as the digging of the tar.   We have seen that in the second paragraph they were required to "diligently and *continuously remove the tar* from said pond," and by the seventh they are liable to a forfeiture if they fail to perform any undertaking on their part, but it is not pretended that if they failed to remove tar for less than ten days that would be a forfeiture.   If such was the result then a failure "to remove the tar" for one day would be cause for forfeiture as well as a failure for three, five or nine days.   But we have seen that it was understood by both parties that the method to be pursued in the business of the appellants was such that there would necessarily be some days when the tar would not be taken out of the pond, as the tanks would be full, and when that was the case there was no occasion to take any out until they were again empty.   It would therefore not be an altogether unreasonable construction to place on the clause we have under consideration, to hold that it referred to a suspension for ten days of *all work* connected with the removal of the tar, including the treatment of it in the tanks as well as the digging it out of the pond, when we are called upon to determine what the parties intended to be such an abandonment of the contract as to cause a forfeiture.   But as what was done by the appellants on the 24th of December entitled them to relief, it is not necessary to pursue this point further, or to rely on it in the disposition of the case we have determined on.   The decree will be reversed, and the cause remanded, in order that a decree may be passsd continuing the injunction heretofore issued until final hearing.

*Decree reversed, aud cause remanded,*
*appellee to pay the costs.*

(Decided July 2nd, 1903.)