# RALPH COVER

## *vs.*

# JOHN C. TALIAFERRO ET AL.

*Construction of Contract—Exploitation of Machinery—Promotion of Corporation—Forfeiture—Equity Jurisdiction.*

An agreement between three persons for the making, marketing, and exploiting certain machinery used in the manufacture of canned food, specifically naming what each party was to do in furtherance of the common plan, and providing that a corporation should be organized to manufacture and sell such machinery, *held* not to bind any of the parties to aid personally in the organization of the proposed corporation.  p. 594

The agreement, while providing that one of the parties named should defray all preliminary expenses incurred in perfecting and demonstrating a practicable machine which could be profitably manufactured and sold, and that such party should supply the money needed to form the company, did not require him to secure money to exploit the assets of the proposed company before or after it was actually incorporated.

pp. 594, 595

In a proceeding to enforce, in a court of equity, a forfeiture under a contract, the court will not resort to any inferences that are not compelled by the clear, direct, and unambiguous language of the contract, especially when the contract was drawn by the party who relies upon the inference to aid and extend the language of the contract.  p. 594

The word "wilful" implies a deliberate intention, for which no reasonable excuse can be given, to do or refrain from doing some act which good faith in the performance of some duty required the promisor to do or not to do, as the case may be.

p. 596

Where a contract between three persons, for the promotion of a corporation to manufacture and sell certain canning machines, provided that one of the parties thereto should "diligently and in good faith undertake and exercise every reasonable effort to secure" the money necessary to exploit the company's assets by the sale of preferred stock, and provided that the "wilful failure" of any party thereto to comply with the terms should effect a forfeiture of his interest, *held* that the party thus named to raise money was entitled to exercise a discretion as to whether he could properly sell such stock to investors, and that he should not be subjected to a forfeiture because he refused to sell such stock, by reason of the uncertainty as to whether the company could secure patent protection for its machines.                                pp. 595-598

A court of equity will not lend its aid to divest an interest or an estate by enforcing a forfeiture except with extreme reluctance, and only in the most extreme cases.            p. 599

*Decided January 19th, 1923.*

Appeal from the Circuit Court of Baltimore City (CAR-ROLL T. BOND, J.).

Bill by Ralph Cover against John C. Taliaferro and John Coyle. From a decree for defendants, plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Richard S. Culbreth,* with whom was *Charles C. Wallace* on the brief, for the appellant.

*William C. Coleman,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

On August 29th, 1919, Ralph Cover, of Westminster, Carroll County, J. C. Taliaferro and John Coyle, both of Baltimore City, entered into an agreement for the exploitation and development of improved machinery to be used in the manufacture of canned goods in processing, sterilizing and preserving the contents of containers of fruits, vegetables and other food products, for some of which improvements letters patent had been applied for. That agreement provided that, upon a satisfactory demonstration of the utility and practicability of a machine embodying the inventions referred to in those patent applications, a corporation should be organized for the exploitation, manufacture and sale of such machines. It further provided that the wilful failure of any party to the contract to perform the obligations imposed by it should effect a forfeiture of all his right, title and interest therein to the other parties thereto.

On July 30th, 1920, Cover filed the bill of complaint in this case, in which he asked that the right, title and interest of each of the appellees in said contract be forfeited to him on the ground that they had wilfully failed to perform the part of the agreement which they had agreed in it to perform. An answer was filed, testimony was taken and after a hearing a decree was passed by the Circuit Court of Baltimore City, dismissing the bill, and from that decree this appeal was taken.

The appeal presents but one question, which is, whether the conduct of the defendants amounted to such a breach of the obligations imposed upon them by the agreement as to warrant a court of equity in decreeing under its terms a forfeiture of their interests and rights therein to the complainant.

In dealing with that question we will inquire (1) what obligations were imposed by the agreement upon the parties to it, (2) what penalty did the agreement exact from the parties for a failure to perform the obligations imposed by

it, (3) did the defendants wilfully fail to perform such obligations, and (4) if they did, should the court decree a forfeiture of their rights and interests in the contract in consequence thereof?

The first question depends altogether upon the construction of the contract, for all the rights, duties, and liabilities of the parties in relation to its subject matter are fixed by its terms. The apparent purpose and object of the parties to the contract was to agree to make, market and exploit certain machinery used in the manufacture of canned food, and more particularly a cooker and cooler called the "Submarine," which was believed to embody improvements over any machine then sold for the complete sterilization of canned food. All the provisions of the contract are subsidiary and incidental to the accomplishment of that purpose. And to that end it states clearly and precisely what each party to the agreement is to do, and what part each is to have in the common plan. Ralph Cover was to be the patent expert, familiar with the law and practice of securing and protecting patents, as well as with the technical and mechanical features, elements, details and functions of machinery used in sterilizing and canning food, and his duty was to investigate the novelty of inventions covered by the agreement, and the possibility of infringing existing patents by the manufacture, sale or use of machines embodying such inventions, to secure data as to the likely profits and hazards of the business, and the conditions under which the machines could be manufactured most successfully, to keep records of all transactions connected with the work, and in short, to do such practical work as might be required to perfect the machine and make the manufacture and sale of it a commercial success, so far as he could by the exercise of reasonable diligence do that. His training and experience had fitted him for such work. He was a member of the bar; he had been engaged seven years in the development of machinery, principally canning machinery, and had made a special study of patent law and was widely experienced in patent matters.

John C. Taliaferro was "to defray all expenses incurred up to the date of the commencement of the first full sized machine in the exploiting and development of the machines herein referred to," and he was to "pay all expenses incurred from the date of the commencement of the first full sized machine to the date of the formation of said corporation." He was the capitalist who was to supply the funds needed for the perfection and completion of a practicable machine, which could be profitably manufactured and sold to manufacturers of canned food for the sterilization of their product. He had been widely engaged in the development and exploitation of patented inventions and had been a director in the Continental Can Company, and one of its founders, and had also been general manager of the American Can Company, and a director in the National Bank of Baltimore, and the Calvert Bank.

John Coyle was to act as a supervising expert and critic, and was to "act in an advisory capacity in the development, designing, construction and testing of any machines embraced by this agreement." He was the assistant general manager of the Baltimore plant of the Continental Can Company, and familiar with the operation of machinery of the character covered by the agreement.

In addition to this specific designation of the duties of the several parties to it, the agreement provides that they "shall use and employ their ideas and inventive skill and ability in the arts embraced by this agreement and in the betterment thereof, and each by sketches and where necessary, by written description, will promptly disclose to the others any new invention therein."

After thus stating the duties of its several parties in relation to the exploitation and development of the machines referred to in it, the agreement provides "that forthwith upon the satisfactory demonstration under service conditions of the utility and practicability of the machine embodying the inventions specifically referred to by patent application serial

numbers in the preamble hereto, a corporation shall be organized under the laws of the State of Maryland, bearing the name 'United Corporation' for the purpose of exploiting, manufacturing, securing the manufacture of, selling, etc., of the machines embraced by this agreement," and after providing for the issue of 2,000 shares of common stock, and for the form of the charter, it further provides "that forthwith upon the formation of said corporation, the parties hereto shall assign all their rights accruing under this agreement to said United Corporation, and they shall receive common stock of said United Corporation in the following proportions immediately after the execution of such assignment: J. C. Taliaferro shall receive 800 shares; John Coyle shall receive 300 shares, and Ralph Cover shall receive 900 shares," and that "the said J. C. Taliaferro, upon the formation of said corporation, will diligently and in good faith undertake and exercise every reasonable effort to secure such sum of money as shall be decided by the parties hereto at that time to be necessary to successfully exploit the company's assets, and for which the parties advancing same shall receive preferred stock in the corporation of a par value in an amount equal to the amount actually secured for and received by the corporation."

And until the formation of the corporation and the making of such assignments, it provides that the rights of the parties "in all machines, inventions, patents, monies and other subject matter of this agreement, shall be in the same proportion as that provided" in the paragraph dealing with the distribution of the common stock.

Having in this manner enumerated the respective duties of the several parties, the agreement, for the protection of innocent parties against the wilful default of either or both of the other parties, contained this provision: "It is further agreed that the wilful failure of any party hereto to comply with the terms hereof shall effect a forfeiture of his title, rights, and interests herein to the other parties hereto, in

proportion to their respective interests, and this contract still shall be effective against such defaulting party with respect to his obligations hereunder. It is further agreed that if such default shall be due to circumstances unforeseen at the time of the execution of this agreement, or to circumstances beyond his reasonable control, then, by mutual agreement, or by submission of the question to arbitration, the rights of the parties shall be adjusted according to the justice and equities of the parties, under the circumstances."

This agreement therefore provided in specific terms (1) what the several parties to it were required to do and (2) for the penalty to be imposed upon any one of them who wilfully failed to carry out its terms. The next question then is, did the defendants wilfully fail to perform any duty imposed upon them by the contract?

In dealing with that question we will revert to the pleadings and look at the bill to learn the particular breach of which the appellant complains, and which is the basis of his suit. The crux of his complaint as stated in his bill is this: "That, thus, the demonstration under service conditions of the utility and practicability of said machine was satisfactory to the said Taliaferro, one of the defendants, and it was equally satisfactory to the said John Coyle, the other defendant, who, as acting assistant general manager of the Baltimore branch of said Continental Can. Co., was under the said Taliaferro, and was one of the mechanical engineers whom the plaintiff consulted in the performance of his, the plaintiff's, part of said agreement; that accordingly, the next step under said agreement was to organize under the laws of the State of Maryland a corporation bearing the name 'United Corporation,' for the purpose of exploiting, manufacturing, securing the manufacture of, selling, etc., of the machines embraced by said agreement, as provided by paragraph five thereof; and to assign to said corporation all the rights of said parties under said agreement, and to issue to said parties the common stock as provided in paragraph six; that in pur-

suance of said provisions, * * * the plaintiff proposed * * *·
that a formal meeting be held for said purposes; that then,
for the first time, was there exhibited by said parties a spirit
other than one of hearty co-operation; that, to the great sur-
prise and disappointment of the plaintiff, who had devoted
his entire time to the enterprise, to the exclusion of other
matters, the defendants refused to attend such a meeting, the
said Taliaferro stating in so many words that he would not
co-operate to organize said corporation; that he would not
pay the expenses of organizing it; that he would not make
any effort to get money further to exploit said assets; and
that, if the matter were referred to arbitrators, he would not
abide by an adverse decision; that, in effect, he would not
perform the part of said agreement to be performed by him
'upon the satisfactory demonstration under service conditions
of the utility and practicability of the machine,' as provided
in paragraph five," and in another paragraph of his bill, in
referring to the forfeiture clause, he says "that, without said
paragraph, the plaintiff would be helpless; that he would have
no adequate remedy at law because of the speculative nature
of the damages, nor in a court of equity because, even though
he were entitled to the specific performance of said agree-
ment, a decree so providing would have little, if any, real
value against unwilling and reluctant associates." That is,
briefly stated, he charges that the defendants were guilty of
these wilful breaches of the contract, (1) that they failed to
attend a formal meeting called by Cover to incorporate the
company, and that Taliaferro would neither pay the expenses
incident thereto nor endeavor to secure money to exploit its
prospective assets, nor would he consent to arbitration, and
(2) that such conduct constituted a "wilful failure" to com-
ply with the terms of the contract.

That contention appears to be predicated on the theory
(1) that the defendants agreed to personally aid in the or-
ganization of the proposed corporation, and (2) that Talia-
ferro agreed to get money to exploit the assets of the partner-

ship and to proceed with the incorporation of the company, immediately upon the successful demonstration of the machine upon which they were at work, regardless of whether it was likely to be a commercial success or not, and regardless of any opinion which Taliaferro may have had on that point; and (3) to supply the money for the organization of the corporation, and that his failure to do these things was wilful. Taking up the first proposition, we cannot accept the construction which the complainant places on the contract in respect to it. Under the literal terms of that contract no one of the parties to it is obliged to form the corporation but any one of them may do so, for the agreement is "that a corporation shall be organized," not that all of the parties to the contract shall be required to organize it. It may of course be inferred from the purpose of the whole instrument that it was the intention of the parties that all should unite in the act of incorporation, but in a proceeding to enforce a forfeiture in a court of equity, we do not feel at liberty to resort to any inferences that are not compelled by the clear, direct and unambiguous language of the contract, especially in a case such as this, where the contract was drawn by the party who relies upon the inference to aid and extend the language of the contract. We do not think therefore that the mere failure of the defendants to participate in the formation of the corporation operated *per se* as a forfeiture of their interests under the contract.

That the complainant could, if he saw fit, have procured the incorporation of the company with or without the consent of the defendants, does not appear to be seriously disputed, and that he did not do it does not appear to have been due so much to a lack of power as to a fear that, if he did incorporate the company, his situation might possibly be worse than that of which he now complains.

Nor, in our opinion, for reasons given at some length below, does the contract require the defendant Taliaferro to secure money to exploit the assets of the proposed company

before or after it was actually incorporated.   The apparent
intention of the parties to the agreement was that Taliaferro
should defray all such preliminary expenses as should be
incurred in perfecting and demonstrating a practicable ma-
chine which could be profitably manufactured and sold, and
that duty he appears to have discharged in good faith.   It was
not their intention that he should supply the funds for the
manufacture and sale of the machines.   In other words he
was to finance the experiment but not to finance the product
of the experiment, and while after the formation of the
corporation he was bound to exercise all reasonable diligence
to secure the funds necessary to exploit its assets, we cannot
assume that it was intended that he should induce innocent
investors to buy stock in a company which he believed was
doomed to failure.

In regard to supplying the money needed to form the com-
pany, the contract is clear and under its terms Taliaferro was
required to pay all such expenses, and it is not denied that he
refused to do that.   In refusing to pay these expenses, Talia-
ferro said that "he was not going ahead, that he was not going
to put any more money into the proposition, that he was not
going to have any one else put any money into the proposition,
that he would stand damages first, that he would not arbi-
trate, that he would not form a company, that he would not
co-operate if the company was formed, and when I asked his
reason he stated it was because his family objected to his
putting any more money into the proposition."   When that
statement was made, it is undisputed that a useful, practica-
ble machine had been perfected and successfully demon-
strated as a result of the efforts of the parties to the contract,
and it appears from the evidence that it would do the work
for which it was designed better than any other machines
then made, nor can it be denied that the complainant fully
and satisfactorily performed every obligation imposed upon
him by the contract, and the inquiry is whether under such
circumstances Taliaferro's refusal to proceed was such a "wil-

ful failure" to carry out the terms of the contract as would
justify the court in decreeing that he had forfeited his in-
terest in it. A number of cases in which the term "wilful"
is defined and applied are collected in *Words and Phrases,*
1st and 2nd series. The judicial interpretation of the phrase,
as illustrated by these cases, coincides with the meaning
given it by the lexicographers, in a definition which is obvi-
ously sensible and sound. That definition, while variously
phrased, always in substance implies a deliberate intention,
for which no reasonable excuse can be given, to do or refrain
from doing some act which good faith in the performance
of some duty required the promisor to do or not to do as the
case may be.

Undoubtedly Taliaferro's refusal to proceed was deliberate
and intentional, so that the only question is whether there
was a reasonable excuse for his conduct. But before consider-
ing the evidence relating to that inquiry, we should know
whether his duty to proceed was absolute or whether it lay
to any extent in his discretion; whether it depended upon
the occurrence of an event or upon the exercise, in good faith,
of his judgment. The thing which he was required to do, was
to secure the investment of capital in the business, possibly
by strangers who would likely rely more upon their confidence
in Taliaferro than upon their knowledge of the business.
Soliciting such investments, he would incur an obligation, not
written in the contract, but which nevertheless would be as
real and binding as any to be found there, and that is the duty
of acting honestly and in good faith with those, who, through
their confidence in him, invested their money in the enter-
prise. The faithful and honest discharge of that duty cannot
be considered apart from the exercise of his personal judg-
ment and discretion, the two things are complementary and
cannot be separated; the duty and the discretion. And in
fact the contract contemplates, as indeed it was bound to do,
the exercise of such a discretion. Its use of the word "wil-
ful," the provision that he is in "good faith" to exercise

every "reasonable" effort to secure investments, and the nature of the duty itself, all point to the existence of such a discretion. We must assume then that whether he would solicit investments in the proposed company was a matter committed to his sound discretion. The reputation and the position of a promoter who secures such investments is a fragile and sensative thing, which reacts directly to the stimuli of success and failure, and the preservation of such influence as he may have requires the exercise of a very delicate discretion and a sound judgment. It is for that reason often very difficult to say that the exercise of such a discretion in a case of this character is unreasonable or in bad faith, because so much depends upon the purely and peculiarly personal judgment of the individual. Taliaferro assigned three reasons for his refusal to go on with the enterprise, one that his family objected to his spending any more money on it, two, that sterilization methods were "up in the air," and three, that it was uncertain whether they could protect the machine by patents.

The first reason may be disregarded and the second reason, in view of Taliaferro's unqualified and enthusiastic approval of the machine, is entitled to no greater consideration.

The third reason has more force. The value of any stock which he might sell to investors would depend upon the commercial success of the company, and that success would depend upon the number of machines it could make and sell at a profit. Taliaferro's position was that the company could not reasonably expect to sell enough machines to make its operation profitable, unless it was protected in its manufacture and sale by a patent monoply, and that it was uncertain whether they could secure such protection.

Cover's position on the other hand may be thus stated: (1) That the agreement did not contemplate the necessity for any such protection, and that whether it could be eventually secured was a mere moot question which did not affect the company's prospects of success, and (2) that the contention

that the situation as to the patents was uncertain and unsat-
isfactory was not made in good faith but was only a device
to evade compliance with the contract.    In regard to the
first of these propositions, we do not agree that the contract
did not contemplate the necessity for patent protection.    The
idea that the machines would be protected by a patent runs
like a thread through the whole agreement.    It is true that
the agreement in providing that "forthwith" upon the satis-
factory demonstration of the utility and practicability of the
machine referred to, a corporation should be formed, did not
in so many words make that event dependent upon the exist-
ence of a patent monopoly.    But when it is considered that
Taliaferro was required to try to sell the stock of that com-
pany, it was not intended that he should sell it unless it was
likely to have some value, and if it was not likely to have
any value in the absence of such protection, Taliaferro could
not honestly sell it to innocent purchasers as a valuable
security, and his refusal to do that, if in his judgment such
protection was essential to the success of the company, can-
not be said to be so unreasonable as to warrant a court of
equity in forfeiting his interest in the contract therefor.
Nor are we able to say from the record that the mere fact that
he expressed such an opinion is in itself evidence of bad faith.

As to the second proposition, it is sufficient to say that the
right of the parties to the agreements to secure the desired
protection is involved in uncertainty.    It is claimed that the
improvements are not patentable and that if patentable they
infringe other patents.    Whether those claims are well
founded presents a question which the trial court could not
decide.    That they exist is not and cannot be disputed, and
we cannot say that Taliaferro, in asserting that the fact that
they do exist made it unlikely that the company could operate
successfully until the uncertainty due to their existence was
removed, acted wilfully or unreasonably.

While it may be going too far to say that a forfeiture will
under no circumstances be enforced in a court of equity, it is

nevertheless true that a court of equity will not lend its aid to devest an interest or an estate by enforcing a forfeiture except with extreme reluctance and only in the most extreme cases, and the general rule is that courts of equity will not aid in the enforcement of a penalty or a forfeiture. In *Cross v. McClenahan,* 54 Md. 21, the Court, in dealing with an application to enforce a statutory penalty, said: "In invoking the aid of a court of equity to enforce the penalty given him by the statute, the appellant has gone to a tribunal that never enforces a penalty. It often relieves against a penalty (unless it be imposed by a statute, when it will not interfere), but it never aids in enforcing a penalty. 2 *Story's Eq.,* secs. 1319, 1326. In section 1319, Story says, 'It is a universal rule in equity never to enforce either a penalty or a forfeiture.' In *Livingston* v. *Tompkins,* 4 Johns. Ch. 431, Chancellor Kent says, 'It may be laid down as a fundamental doctrine of the court, that equity does not assist the recovery of a penalty or forfeiture.' " And in *Brown* v. *Rasin Monumental Company,* 98 Md. 9, Judge Boyd, delivering the opinion of the Court, said, in dealing with the forfeiture clause of a contract: "It was said by Chancellor Kent in *Livingston* v. *Tompkins,* 4 Johns. Chan. 431, that 'It may be laid down as a fundamental doctrine of the Court, that equity does not assist the recovery of a penalty or a forfeiture,' and in 2 *Story's Eq. Juris.,* sec. 319, that 'It is a universal rule in equity, never to enforce either a penalty or a forfeiture'—both of which are cited in *Cross* v. *McClenahan,* 54 Md. 24. We are of course aware that there is a distinction between giving the active, affirmative aid of a court of equity to declare a forfeiture, and simply recognizing that a forfeiture has taken place, under a contract made between the parties which the court must recognize and be controlled by. But a court of equity can, and ought to. require a party claiming the benefit of a forfeiture such as this to do his full duty, and not in any way be responsible for the failure of the other party to strictly comply with the contract before he should be permitted to assert it."

And in *Baumgartner* v. *Haas,* 68 Md. 39, it is said:

"But it has been further argued that a court of equity while it may relieve against, yet will never aid in the enforcement of, a penalty; and that the postponement of the debt of the defendant to the claims of the other creditors is a penalty upon him, and therefore a court of equity will not enforce it. There is no doubt of this law. It is laid down in the text writers and fully sanctioned in *Cross* v. *McClenahan,* 54 Md. 21. But this law applies to cases where the aid of a court of equity is sought to enforce a penalty. Now this is not a suit to enforce a penalty, but simply a suit by a creditor to recover a just debt. Penalties in civil matters are imposed by statute or by agreement of parties, principally the latter. The case of *Cross* v. *McClenahan,* above mentioned, is an example of the former, and *McKim* v. *Mason,* 3 Md. Ch. 186, an example of the latter." See also 10 *R. C. L.* p. 336; 21 *C. J.* 104.

Applying these principles to the facts before us, while there was much in the conduct of the defendant Taliaferro, in his relations with the appellant, which merited the criticism of appellant's counsel, after a very careful consideration of the arguments presented with much force and earnestness on behalf of the appellant, we cannot say that on the whole record we would be justified in departing from the rule so long established and so uniformly followed in this State, to wit, that a court of equity will not, upon such facts as are before us, enforce a forfeiture, and we will therefore affirm the decree appealed from.

*Decree affirmed, with costs.*