988 A.2d 1143

**Jeffrey Lynn HURD**

v.

**STATE of Maryland.**

**No. 2725 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

Feb. 3, 2010.

482

Kate M. Bell (Joshua R. Treem, David I. Weinstein, Schulman, Treem, Kaminkow & Gilden, PA, on the brief), Baltimore, MD, for Appellant.

Michelle W. Cole (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: SALMON, WRIGHT, and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

SALMON, Judge.

Arthur Pereschuk, in July of 2007, owned a two-year-old Labrador Retriever named Bristol.[1] Mr Pereschuk and his

---

1. The dog's name is spelled interchangeably as "Bristol" and "Bristal" in the record. We have adopted the spelling used by Mr. Pereschuk in his written statement.

dog lived in a rural area of Washington County near the appellant, Jeffrey Hurd. Also living nearby was Mr. Pereschuk's son-in-law, James Randolph. Randolph owned a German Shepherd named Harley.

On July 22, 2007, Hurd saw Mr. Pereschuk's dog chasing a deer on his (Hurd's) property. Hurd picked up his high power rifle and shot Bristol twice. The second shot was fatal.

About ten months after Hurd killed Bristol, on May 8, 2008, Hurd saw Randolph's German shepherd chasing a wild turkey on his property. Once again Hurd acted unhesitantly. He fired his rifle twice from his kitchen window at Harley, who was 170 yards away. The first bullet struck Harley and crippled him. The second shot missed. He got more shells, reloaded, and shot at the German shepherd a third time. Hurd's last shot killed the dog. At the time of his death Harley was one year old.

Hurd faced criminal charges in the Circuit Court for Washington County as a consequence of having killed the dogs. He elected a bench trial and proceeded on an agreed statement of facts.

The trial judge found Hurd guilty of two counts of aggravated cruelty to animals in violation of Md.Code (2002), § 10–606 of the Criminal Law Article, and two counts of violating section 6–301 of that same article, which prohibits the malicious destruction of property valued under $500.00.

Sentencing took place on December 5, 2008. As to the aggravated cruelty to animals charges, Hurd was sentenced to two concurrent three-year terms of imprisonment, to be served at the Washington County Detention Center, with all but ninety days suspended in favor of three years of probation. As to each of the malicious destruction of property charges, Hurd was sentenced to sixty days imprisonment, but the sentences were to run concurrent with those imposed for aggravated cruelty to animals.

Hurd noted a timely appeal and presents four questions for our review:

I. Did the circuit court err in ruling that Maryland Code, Natural Resources Article, § 10–416(b)(3), was not a complete defense to both counts related to the July 22, 2007, incident?

II. Did the circuit court err in finding that Hurd "cruelly killed" the dogs as that term is used in Maryland Code, Criminal Law Article § 10–606?

III. Did the circuit court err in rejecting Hurd's necessity defense where it discounted Hurd's property interests and over-valued the dogs as a matter of law?

IV. Did the circuit court err in finding Hurd guilty of malicious destruction of property where there was no evidence in the agreed statement of facts from which it could properly infer maliciousness?

## I.

A statement of facts was read into the record at trial describing what each witness would testify to in regard to the shootings that occurred in 2007 and 2008.

### A. The July 22, 2007, Incident

Arthur Pereschuk was the owner of the black Labrador retriever that was killed by Hurd on July 22, 2007. Mr. Pereschuk provided the following written statement, which was read into evidence:

On Sunday July 22, my family and I had a cookout and afterwards was playing badminton. I [had] taken Bristol, my Labrador Retriever down to be with us. I fastened him to a tree with a cable. My son came with his Golden Retriever, Jake. Jake likes to tease Bristol by getting close to her but just far enough away that she could not jump on him or touch him. After about five minutes of this I'd left [sic] Bristol lose [sic] to play with Jake. They run up to the house and back and forth at around the area where we were. I started playing badminton and forgot about the dogs. About ten minutes later I heard two [gun]shots. My son immediately began calling our dogs. Jake came back

within a minute but there was no Bristol. I called Jeff Hurd and left a message that I was looking for my dog. Then my son and I drove back to Hurd's house. His wife came to the door and told us her husband was not there. When I got back to the house I was outside looking for my dog. My wife told me Hurd was on the phone. He said he was in his tree stand. He said he was reading his Bible, looked up and saw my dog holding on the hind quarter of a deer and that he shot and killed the dog.

Mr. Pereschuk did not report immediately to the police the fact that Hurd had shot his Labrador retriever because he was intimidated by "previous comments" made by Hurd. A report was made only after Hurd killed Harley.

In May of 2008, Hurd gave a written and oral statement to Trooper First Class Ford, a Maryland State Police Trooper. Regarding the killing of Bristol, Hurd's written statement read:

Last Fall I shot a big black dog five feet behind a deer and I did know that dog belonged in those four houses and those seven acres and I shot one of their dogs twenty five years ago and if they want their dogs I think they should keep them on their own property.

Hurd also told TFC Ford that after Bristol was killed, Mr. Pereschuk told him (Hurd) that he "would not pen his dogs up."

James Rudolph ("Rudolph"), Mr. Pereschuk's son-in-law, telephoned Hurd after he heard the news that Bristol had been shot. The purpose of the call was to make arrangements with Hurd so Rudolph could pick up Bristol's body. During the telephone call, Hurd told Rudolph: "You know, I didn't kill [the dog] with the first shot." The next day, as Rudolph was putting Bristol's body in his vehicle, Rudolph told Hurd: "I have a German [Shepard] and a Daschund [sic] and if you ever see either one on your property I expect a call first." Rudolph said that Hurd then shook his head like he understood.

### B. The May 8, 2008, Incident

On May 8, 2008, at 6:20 p.m., TFC Ford responded to 15707 Jones Chapel Lane, Hagerstown, Maryland, in Washington County, in reference to an animal cruelty complaint. He was met by James Rudolph, who advised that Harley, Rudolph's German shepherd, had just been killed by Hurd.

Rudolph provided TFC Ford with the license number of the dog and also gave a written statement that read:

> On May 8th of 2008 I walked my dog with a leash out our lane at Jones Chapel Lane. After returning, by Arthur Pereschuk, my father-in-law's house I stopped to talk with him. At that point I let Harley off his leash like I did daily to play with Cookies, Arthur's new dog. After about five minutes I motioned to Harley[, the German shepherd,] it was time to go. He ran in front of me about ten yards. At that point he saw a rabbit and took off running. My son Kevin was rounding the corner of the lane and told me Harley ran on Hurd's property. I ran over to the property line and started yelling, "Harley, come. Harley, come," and clapping my hands. And within fifteen seconds I heard a high-powered rifle shot. Immediately I ran towards Hurd's property. I had a difficult time crossing the bob wire fence and pushing through the thick wooded area. Once I arrived in the clearing I saw Harley on the ground. I ran up to him and he was still breathing. As I was trying to make it through the woods two other shots rang out after the first shot. There was a pause and the two shots followed. I yelled out in the open area. "I told you to call me if you ever saw my dogs on your property." Jeff [Hurd] came down from his house and started yelling. Yelling, "He was over here all the time." I said, "He is penned up and you're a liar." Jeff said, "I will show you paw prints." ... I was approximately half the distance of a football field away when the first shots were fired.

TFC Ford also interviewed Hurd at his residence at 11845 Camden Road, Williamsport, Maryland. Hurd admitted to shooting Harley. He said that the German shepherd was

chasing a turkey that was on his property. Hurd showed TFC Ford the Browning 243 caliber rifle that he had used to kill Harley.

Hurd voluntarily went to the Maryland State Police Hagerstown Barracks where he provided a written statement that, in pertinent part, read:

> I came home from work and came into the house. I see the German Shepherd chasing [a] turkey in my yard on the other side of the pond and I seen this dog chase deer and turkey many times in the past year. I did not know who the dog belonged to. I got the gun, 243 Winchester Short Magnum, opened the kitchen window and shot the dog two times out of three shots at one hundred and seventy yards. First shot I crippled the dog so I shot real quick and missed and went into another room and got two more shells and I shot three shots, third shot and that killed him.

## II.

### A. Issue One

Because Bristol, the Labrador retriever killed by Hurd on July 22, 2007, was chasing a deer at the time she was shot, appellant argues that Md.Code (2000, 2007 Repl.Vol.), § 10–416(b)(3)(ii) of the Natural Resources Article provided him with a complete defense to all charges arising out of the July 22, 2007, incident. He does not contend that section 10–416 has any relevance to the two charges arising out of the May 8, 2008, incident when he shot Rudolph's German shepherd.

Section 10–416 of the Natural Resources Article reads:

### § 10–416. Deer hunting—Prohibited methods.

(a) *Use of automatic firearms and certain bullets.*—(1) A person may not hunt deer in the State with any automatic firearm. In this subsection, an automatic firearm means a firearm designed to fire, or which is mechanically altered to fire, 2 or more shots with 1 continuous pressure on the trigger.

(2) A person may not use full metal-jacketed, incendiary, or tracer bullets in hunting deer in the State. However, the use of metal-jacketed bullets designed to expand on impact is not prohibited.

(3) A person may not hunt deer with any firearm that uses an ammunition clip holding more than 8 cartridges or bullets. In this paragraph, "ammunition clip" includes a cartridge or bullet holder called a banana clip.

(b) *Hunting with dogs.*—(1) Except as provided in regulations adopted by the Department under paragraph (2) of this subsection, a person may not:

(i) Take a dog into the woods or possess or control a dog in the woods; and (ii) Use the dog to hunt or pursue deer.

(2) *The Department shall adopt regulations governing the use of dogs to aid in the prompt recovery of killed, wounded, or injured deer.*

(3)(i) In Baltimore, Harford, Howard, Montgomery, Prince George's, Somerset, and Worcester counties[2] a person may not kill a dog found pursuing a deer.

(ii) *In all other counties, any Natural Resources police officer, law enforcement officer, or any other person may kill any dog found pursuing any deer, except in accordance with regulations adopted under paragraph (2) of this subsection.*

(iii) In Caroline, Dorchester, Talbot, Kent, Anne Arundel, Cecil, Charles, Garrett, St. Mary's, Queen Anne's, Frederick, Carroll, and Calvert counties, *dogs that are engaged in fox hunting and who have broken away may not be killed under this paragraph.*

(c) *Hunting with spotlights.*—A person or 2 or more persons together may not throw or cast the rays of a spotlight, headlight, artificial light, battery, or other device

---

2. Washington County was added to § 10–416(b)(3)(i) in 2009, after the events of this case took place. Therefore, in Washington County—at present—under no circumstances is it permissible for anyone (other than law enforcement or Natural Resources Police Officers) to shoot a dog found pursuing a deer.

on any highway or in any field, woodland, or forest while possessing or having under control a firearm or other implement by which any deer could be killed, even though the deer is not shot at, injured, or killed. The provisions of this subsection do not apply where the headlight of a motor vehicle, operated by any person traveling on a highway in the usual way, casts a light upon deer on or adjacent to the highway and there was no attempt or intent to locate the deer.

(d) *Penalties for hunting deer with spotlight.*—Any person who violates any provision of subsection (c) of this section is guilty of a misdemeanor and upon conviction is subject to a fine not exceeding $2,000 or imprisonment for not more than 6 months or both, with costs imposed in the discretion of the court. Any person convicted of violating the provisions of this subsection shall have the person's hunting license revoked and shall be denied the privilege of hunting in the State for at least 2 and not exceeding 5 years. In addition to these penalties, every spotlight, artificial light, battery, or device to spot, locate, or hunt for deer, and every firearm, bow and arrow, or device capable of killing a deer, found in or on any vehicle or in possession of the person convicted, or used to violate the provisions of this subsection, shall be confiscated and disposed of by the Secretary as the Secretary deems advisable.

(Emphasis added).

In this Court, as well as in the trial court, appellant argued that under the language of section 10–416(b)(3)(ii) he was permitted to kill Bristol. Put another way, appellant contends that, except for dogs being utilized in accordance with regulations governing the use of dogs to aid in the "prompt recovery of killed, wounded, or injured deer," in Washington County "any ... person may kill any dog found pursing any deer." *See* section 10–614(b)(2) and 10–614(b)(3)(ii).

In a written Opinion and Verdict filed on November 6, 2008, the trial judge said:

Defendant maintains the language of 10–416(b)(3), in conjunction with the Stipulation, which indicates Brist[o]l was pursuing a deer, renders the shooting justifiable; however, this argument fails to address both the context and scope of 10–416(b)(3). Within the Natural Resources Article, 10–416(b)(3) under subtitle 4, "Hunting Restrictions—in General" 10–416(b)(3) is titled "Deer Hunting—Prohibited Methods" and subsection (b) of 10–416(b)(3) bears the title "Hunting with dogs."

The context of 10–416(b)(3) makes clear the purpose behind the statute is two-fold: to prohibit the act of humans hunting deer with dogs; and not penalize those aiding in the prevention of such hunts, and the record discloses in this case that a deer-hunting situation did not occur. More importantly, the elements of both crimes charged in relation to the 2007 shooting have been proven beyond a reasonable doubt. There is no evidence to indicate 10–416(b)(3) acts to provide a defense to the crimes charged in the instant case, and Defendant's assertions his actions were justified under 10–416(b)(3), are without merit and fail.

In addition, [section] 10–413(c) bolsters the decision that [section] 10–416(b)(3) fails to afford Defendant an adequate defense. Subtitle 10–413(c) states: "Any Natural Resources police officer or any law enforcement officer may kill any dog, which does not bear a license, found destroying game birds or mammals or the nest or eggs of any game bird or mammal." The language of 10–413(c) specifically addresses the proper protocol for killing dogs found destroying mammals in non-deer-hunting situations, and 10–413(c) only permits a Natural Resources Police Officer to kill an unlicensed dog found destroying a mammal.[3] Therefore, pursuant to 10–413(c), Defendant was not permitted to shoot Brist[o]l, a licensed pet, even if pursuing a deer, and due to Brist[o]l's

---

3. We agree with appellant that section 10–413(c) of the Natural Resource article is not controlling because the specific statute dealing with shooting a dog pursuing a deer (section 10–416(b)(3)(ii)), controls over a general statute relating to shootings of mammals.

licensed status, even a Natural Resources police officer could not have killed her under identical circumstances.

Both the trial judge and the State shared the view that the purposes of section 10–416(b)(3) were "to prohibit the act of human beings hunting deer with dogs" and to not penalize those trying to prevent such hunts. This appears to be the purpose of section 10–416(b)(1). But it is clear that those purposes would not pertain to section 10–416(b)(3) because section 10–416(b)(3)(iii) disallows (in certain counties) the shooting of a dog pursuing a deer if the dog was "engaged in fox hunting but has broken away." Such an exception would not have been necessary if section 10–416(b)(3) was only meant to apply to human beings hunting deer with dogs—as opposed to hunting after game.

The State argues that the intent of the legislature when it enacted section 10–416(b)(3) can be ascertained by the Title and the subheading used in the statute in question.

In *Mamsi Life & and Health Ins. Co., v. Wu*, 411 Md. 166, 176–77, 182, 983 A.2d 88 (2009), the Court of Appeals said:

We have said that there is an ambiguity within a statute when there exist two or more reasonable alternative interpretations of the statute. When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal. If the true legislative intent cannot readily be determined from the statutory language alone, however, we may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.

*See also Cent. Credit Union of Md. v. Comptroller of the Treasury,* 243 Md. 175, 181, 220 A.2d 568 (1966).

Section 10–416(b)(3) is ambiguous. It can be reasonably read to give a person the right to shoot dogs who are pursuing deer, unless the dogs are being used in accordance with regulations allowing for the use of dogs in the prompt recovery of killed, wounded, or injured deer. As appellant points out, that is what section 10–416(b)(3)(ii) specifically allows. And, if such a privilege is granted by section 10–416(b)(3), criminal statutes (like the ones under which appellant was convicted) cannot be interpreted to nullify that privilege. On the other hand, especially if one were to focus (as the trial judge did on the titles used in the statute and its organization) the statute could reasonably be read to mean that a person may kill a dog pursuing a deer only if the dog has been employed by his owner/handler in hunting (some animal other than foxes) immediately before the dog is killed. There are problems with this interpretation, however, because in many cases the person who kills the dog would not know beforehand whether the dog was simply running loose or whether the dog's owner (prior to shooting, was) using the dog to hunt game.

Rules of statutory construction such as those referred to by the State are only to be resorted to if the statute is ambiguous. *See Mamsi, supra.* But in a criminal law context, a rule of lenity is to be applied that ambiguous statutes are to be interpreted in favor of the defendant. *See Webster v. State,* 359 Md. 465, 481, 754 A.2d 1004 (2000).

Based on the rule of lenity, we construe section 10–416(b)(3), with one exception, as giving persons in Washington County (prior to the 2009 amendment) a right to kill a dog pursing a deer whether or not the dog (prior to being killed) was being used for purposes of hunting game. The exception (not here applicable) is the one already mentioned, i.e., if the dog is being used in accordance with regulations adopted by the Department of Natural Resources, "governing the use of

dogs to aid in the prompt recovery of killed, wounded, or injured deer."

For the above reasons the trial judge should have acquitted appellant of the two charges arising out of the July 22, 2007, incident.[4]

## B. Issue Two

Section 10–416 of the Natural Resources Article gave appellant no privilege to kill a dog pursuing a turkey. Appellant admits this, but contends that he should have been acquitted of the May 8, 2008, charges because he did not "cruelly" kill Rudolph's German shepherd.

Section 10–606(a)(1) of the Criminal Law Article reads, in pertinent part, as follows: "A person may not: intentionally . . . cruelly kill an animal."

Section 10–601(c)(1) of the Criminal Law Article defines "cruelty" as "the unnecessary or unjustifiable physical pain or suffering caused or allowed by an act, omission, or neglect."

■ Under the facts of this case, we agree with the trial judge that appellant "cruelly" killed Harley, as that term is used in section 10–606(a)(1). To start with, it can be inferred, legitimately, that Harley suffered pain in the interlude between the first shot, which crippled him, and the fatal third shot. Nothing in the record suggests that it was either justified or necessary to shoot at the dog either time.

## C. Issue Three

Appellant contends that the defense of necessity excuses his killing of Harley.

Appellant bases his necessity defense on the following assertions: 1) Hurd took the action he did because he was

---

**4.** The statute's wording would appear to allow the shooting, by anyone, of a dog pursuing a deer—not just land owners. This broad scope of the statute together with ambiguity makes it difficult to ascertain the statutes' legitimate purpose. It might be useful for the General Assembly to review and revise section 10--416(b).

seeking to avoid three harms: interference with his enjoyment of his property, ongoing physical damage to his property, and the harm to the wildlife being chased by Harley; 2) Hurd's interest in enjoying and preserving his land and the wildlife on it was more valuable than his neighbor's dog, which has virtually no value; and 3) there was no evidence before the trial court that any alternatives were available to him.

■ Before discussing the validity of the foregoing argument, it is important to bear in mind that at common law—and presently—necessity is an affirmative defense. *See Dixon v. United States,* 548 U.S. 1, 8–9, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006). In other words, the State is not required to rebut the defense until such time as the defendant presents evidence that, if credited, would make the defense applicable.

■ In *Marquardt v. State,* 164 Md.App. 95, 135–36, 882 A.2d 900 (2005), we set forth the five elements that *all* must be present in order for a defendant to avail himself of the necessity defense. We need, however, to discuss only one of those elements viz:

> Intention to avoid harm—to have the defense of necessity, the defendant must have acted with the intention of avoiding the greater harm. Actual necessity, without the intention, is not enough. However, an honest and reasonable belief in the necessity of his action is all that is required.

*Id.* at 136, 882 A.2d 900. (quoting *Sigma Reproductive Health Ctr. v. State,* 297 Md. 660, 678, 467 A.2d 483 (1983)).

■ At the conclusion of the presentation of the agreed statement of facts, defense counsel vigorously contended that Harley was shot to prevent the destruction of the wild turkey or to protect Hurd's land. But in the agreed statement of facts, appellant never said why he killed the German shepherd. And, based on the facts presented it could not have been inferred, legitimately, that he shot the dog to protect a turkey or to protect his land. From the evidence we do not know where the turkey was in relation to the dog when appellant commenced firing or whether, when appellant shot the dog, the wild turkey had taken flight or whether the

turkey was ever in any danger. Thus, the evidence did not support a finding that appellant acted "with the intention of avoiding the greater harm", i.e., harm to the turkey. Under such circumstances the trial judge did not err when he declined to acquit appellant as to charges arising out of the May 8, 2008, incident, based on the necessity defense.

### D. Issue Four

The last issue raised by appellant concerns his conviction for malicious destruction of property worth less than $500.00. Appellant contends (in regard to the May 8, 2008 incident) that the State failed to prove that he acted maliciously. Appellant points out that section 6–301(a) of the Criminal Law Article provides: "A person may not willfully and maliciously destroy, injure, or deface the real or personal property of another."

"Malicious destruction of property ... is a specific intent crime, which 'requires both a deliberate intention to injure the property of another and malice.'" *Marquardt*, 164 Md.App. at 152, 882 A.2d 900 (quoting *Shell v. State*, 307 Md. 46, 68, 512 A.2d 358 (1986)).

Appellant's argument continues:

The Court of Appeals "has clearly indicated that effect must be given to both the element of willfulness and the element of malice." *Shell*, 307 Md. at 65, 512 A.2d 358. It held that:

The term 'wilfully,' for the purposes of such an accusation, is used to characterize and act done with deliberate intention for which there is no reasonable excuse (*Cover v. Taliaferro*, 142 Md. 586, 122 A. 2). And the word 'maliciously' is *descriptive* of a wrongful act committed deliberately and without legal justification....

Appellant asserts, based on the just discussed "necessity" defense, that the act of shooting the dog twice was not malicious. This contention is without merit because, as dis-

cussed *supra*, appellant did not introduce any facts that, if believed, would support a necessity defense.

Appellant next points out:

In addition, in order for the court to find willfulness, " 'it is not sufficient that the defendant merely intended to do the act which led to the damage to property; it is necessary that the defendant actually intended to cause the harm to the property of another.' " *Marquardt,* 164 Md.App. at 152, 882 A.2d 900 (quoting *In re Taka C.,* 331 Md. 80, 84, 626 A.2d 366 (1993)).

According to appellant,

[T]here was insufficient evidence for the court to find, beyond a reasonable doubt, that Hurd knew the dog he shot in [May] of 2008 belonged to a neighbor, and was not a stray or abandoned animal.

\* \* \*

The issue is whether Hurd *knew at the time he shot* the dog that he was destroying someone's property, which was not proven. Hurd therefore cannot be said to have intended to cause harm to the property of another, and the act of shooting Randolph's dog was not willful.

 We hold that the evidence was sufficient to show that appellant knew, prior to shooting Harley, that he was not shooting a stray dog.[5] First, about ten months before appellant killed Harley, Randolph told appellant, his neighbor, that he owned a German Shepherd and asked appellant to call him (before shooting it) if the German Shepherd ever went on his property. Regarding what happened on the day Harley was shot, Randolph said in his written statement:

Once I arrived in the clearing I saw Harley on the ground. I ran up to him and he was still breathing. As I

---

5. It was not necessary for the State to prove who owned the dog. "[P]roof of ownership is not a material element of the crime of 'Malicious Destruction of Property[,]' " but rather "proof that the subject property is that of 'another' is all that is required." *Burgess v. State,* 89 Md.App. 522, 541, 598 A.2d 830 (1991). ·

was trying to make it through the woods two other shots rang out after the first shot. There was a pause and the two shots followed. I yelled out in the open area. *'I told you to call me if you ever saw my dogs on your property.'* Jeff [Hurd] came down from his house and started yelling. Yelling, 'He was over here all the time.' I said, 'He is penned up and you're a liar.' Jeff said, 'I will show you paw prints.'

(Emphasis added.)

From the above evidence the trial judge inferred that appellant knew he was destroying the property of Randolph. This inference was a legitimate one in light of the fact that eight months before Harley was shot, Randolph advised appellant that he owned a German Shepard and begged appellant not to shoot it.

**JUDGMENT ENTERED AS TO COUNTS 2 AND 4 REVERSED; JUDGMENT ENTERED AS TO COUNTS 1 AND 3 AFFIRMED; COSTS TO BE PAID FIFTY–PERCENT (50%) BY APPELLANT AND FIFTY–PERCENT (50%) BY WASHINGTON COUNTY.**