983 A.2d 88

**MAMSI LIFE & HEALTH INSURANCE COMPANY et al.**

v.

**KUEI–I WU et al.**

Misc. No. 8, Sept. Term, 2008.

Court of Appeals of Maryland.

Oct. 20, 2009.

Reconsideration Denied Dec. 9, 2009.

---

Jeffrey A. Lutsky (Christine M. Debevec, Stradley, Ronon, Stevens & Young, LLP, Philadelphia, PA, Lawrence P. Fletcher-Hill, Gordon, Feinblatt, Rothman, Hofberger & Hollander, LLC, Baltimore), on brief, for Appellants.

Philip Friedman (Friedman Law Offices, PLLC, Washington, DC, Philip O. Foard, Towson, Dennis F. O'Brien, Dennis F. O'Brien, P.A., Bel Air), on brief, for Appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

We have before us a question of law certified by the United States District Court for the District of Maryland pursuant to the Maryland Uniform Certification of Questions of Law Act, Md.Code (1973, 2006 Repl.Vol.), § § 12–601 to 12–613 of the Courts and Judicial Proceedings Article and Maryland Rule 8–305. We are asked to decide whether Md.Code (1995, 2006 Repl.Vol.), § 19–507 of the Insurance Article restricts the ability of health insurers and HMOs to provide in group or individual contracts that health benefits may be secondary to Personal Injury Protection ("PIP") benefits under an automobile insurance policy. We shall conclude that it does not. Our interpretation is informed by the legislative subtitle to sections of the Insurance Code governing the requirement of PIP coverage in auto insurance policies, including § 19–507, enacted by the 1972 Comprehensive Act amending the Insurance Code, Chapter 73 of the Acts of 1972. Further, our interpretation of Maryland law rests on the text and location of § 19–507, within the statutory scheme, as well as the existence of separate portions of the Maryland Code that specifically govern non-duplication or coordination of benefits by health insurers and HMOs.

*I.*

We adopt the facts as set forth by the United States District Court for the District of Maryland. The court stated:

The instant case arises out of a class action complaint filed by Plaintiff Kuei–I Wu ("Wu") on September 24, 2004 in the Circuit Court for Baltimore County against her healthcare provider, MAMSI Life and Health Insurance Co. ("MLH"), and MLH's parent companies, Mid–Atlantic Medical Services LLC and Mid–Atlantic Medical Services, Inc. ("MAMSI") for breach of contract (Count I), breach of the duty of good faith and fair dealing (Count II), and civil conspiracy (Count III). On September 26, 2001, Wu was involved in an automobile accident while she was a full-time student at the University of Maryland. At the time of the accident, Wu carried at least two insurance policies—(1) a health insurance plan issued by MLH; and (2) an automobile policy issued by GEICO. Wu's health insurance plan was not governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

Wu sought treatment with participating healthcare providers under the Preferred Provider Option ("PPO") plan to which she belonged. In exchange for providing medical care to MAMSI members, participating healthcare providers were paid at a negotiated rate and agreed not to balance, bill, or collect any other amount from members for whom they provided "Covered Services." Wu's contract with MAMSI contained a Coordination of Benefits provision that explicitly excluded any no-fault automobile insurance payments, such as PIP, from being considered in the application of the Coordination of Benefits procedures. Wu alleges that, "in a separate document known as the Provider Manual for Physicians and Practitioners, MAMSI illegally directs all providers within its healthcare plans that when a patient has been involved in an automobile accident, the providers must collect PIP benefits from the patient's automobile insurer first, before submitting any claims to MAMSI for payment."

Thus, according to Wu's Complaint, MAMSI paid the participating healthcare providers for services rendered to Wu only after her PIP benefits were exhausted. This scheme, Wu contends, is in direct violation of section 19–507 of the Insurance Article of the Maryland Code, which provides that PIP benefits "shall be payable without regard to … any collateral source of medical, hospital, or wage continuation benefits."

On April 5, 2007, approximately thirty months after Wu filed her Complaint, the Circuit Court for Baltimore County certified a class consisting of "all owners of MAMSI healthcare plans since September 23, 2001 that also have automobile insurance policies, have had an automobile accident, and whose mandatory PIP coverage was partially or entirely exhausted prior to the use of any MAMSI healthcare benefits." The class certification order on April 5, 2007 brought into the case for the first time class members with employee health plans governed by ERISA. On May 3, 2007, Defendants timely filed a Notice of Removal, having done so within thirty days of the introduction of a federal question based on ERISA preemption. After this Court denied the Plaintiff's Motion to Remand by Order dated October 29, 2007, Plaintiffs proceeded with discovery pursuant to this Court's Scheduling Order.

After a discovery dispute was brought to this Court's attention during a telephone conference on May 7, 2008, the parties were permitted to brief issues relating to the size of the class. The parties filed cross motions, Defendants' Motion for Clarification of Class Membership and Plaintiffs' Cross Motion for Clarification of Class Definition, both of which were fully briefed.

The motions were framed as requests to modify the size of the class certified by the Circuit Court for Baltimore County, but the Defendants also called into question whether section 19–507 of the Insurance Article of the Maryland Code regulated health insurers. Although the class certifi-

cation order from the Circuit Court for Baltimore County was amended slightly, this Court did not amend the class certification order to exclude ERISA plan members because Defendants' "argument appear[ed] intertwined with a more fundamental question that reaches the crux of the entire case," and that "[r]esolution in favor of Defendants on this issue could prevent *any* claim by Plaintiffs under 19–507, whether by a member of an ERISA plan or not."

The United States District Court concluded that the issue before it presented an "issue of first impression in Maryland law" and that it was more appropriate for the issue to be resolved by this Court.[1] Accordingly, the District Court certified the following question of law to this Court:

> Does Maryland Code, Insurance Article § 19–507 prohibit or restrict a Maryland health insurer or a Maryland health maintenance organization from providing in its group or individual contracts of insurance or membership contracts that its contractual health benefits may be secondary to Personal Injury Protection ("PIP") benefits under an automobile liability insurance policy where the automobile liability insurer is legally obligated to provide benefits for health-care expenses? [2]

---

**1.** Because we conclude that Md.Code (1995, 2006 Repl.Vol.), § 19–507 of the Insurance Article does not limit the ability of a health insurer or HMO to provide in its group or individual contracts that its health benefits may be secondary to personal injury protection ("PIP") benefits under an automobile policy, it is unnecessary for us to engage in any analysis pertaining to whether § 19–507 of the Insurance Article is preempted by the Employment Retirement Insurance Security Act of 1974, Pub.L. 93–406, 88 Stat. 829 (codified as amended in scattered sections of 5 U.S.C., 18 U.S.C., 26 U.S.C., 29 U.S.C., and 42 U.S.C.).

**2.** The question of whether MAMSI Life and Health Insurance Co. ("MAMSI") breached its insurance contract with Wu is not before this Court. The United States District Court may or may not determine that Wu's insurance policy with MAMSI obligated MAMSI to pay the participating healthcare providers, regardless of whether the Personal Injury Protection ("PIP") coverage also obligated the automobile insurance carrier. Nonetheless, we conclude that such an obligation does not arise out of the statute at issue here.

## *II.*

Section 19–507 of the Insurance Article [3] provides:

**Same—When benefits payable; coordination of policies; surcharge; subrogation.**

(a) *When benefits payable.*—The benefits described in § 19–505 of this subtitle shall be payable without regard to:

(1) the fault or nonfault of the named insured or the recipient of benefits in causing or contributing to the motor vehicle accident; and

(2) any collateral source of medical, hospital, or wage continuation benefits.

(b) *Coordination of policies.*—(1) Subject to paragraph (2) of this subsection, if the insured has both coverage for the benefits described in § 19–505 of this subtitle and a collateral source of medical, hospital, or wage continuation benefits, the insurer or insurers may coordinate the policies to provide for nonduplication of benefits, subject to appropriate reductions in premiums for one or both of the policies approved by the Commissioner.

(2) The named insured may:

(i) elect to coordinate the policies by indicating in writing which policy is to be the primary policy; or

(ii) reject the coordination of policies and nonduplication of benefits.

(c) *Surcharge prohibited.*—An insurer that issues a policy that contains the coverage described in § 19–505 of this subtitle may not impose a surcharge for a claim or payment made under that coverage and, at the time the policy is issued, shall notify the policyholder in writing that a sur-

---

**3.** Section 19–507 of the Insurance Article must be read in conjunction with Md.Code (1995, 2006 Repl.Vol.), §§ 19–505 and 19–506 of the Insurance Article. Section 19–505 of the Insurance Article is entitled **"Personal injury protection coverage—In general."** This section provides that every automobile insurance policy issued in Maryland must contain Personal Injury Protection ("PIP") coverage, unless the coverage is waived in accordance with the provisions of § 19–506, which is entitled **"Same—Waivers."**

charge may not be imposed for a claim or payment made under that coverage.

(d) *Subrogation.*—An insurer that provides the benefits described in § 19–505 of this subtitle does not have a right of subrogation and does not have a claim against any other person or insurer to recover any benefits paid because of the alleged fault of the other person in causing or contributing to a motor vehicle accident.

*Id.*

MAMSI argues that § 19–507 of the Insurance Article applies only to automobile insurers[4] and thus, does not prohibit benefits coordination by health insurers and HMOs. MAMSI contends that its position is supported by: (1) the location, title, and language of § 19–507, (2) the existence of distinct sections of the Health Insurance Title of the Insurance Article and the Maryland HMO Act that specifically govern non-duplication or coordination of benefits by health insurers and HMOs, and (3) an understanding of the basic characteristics of health insurance, particularly group health insurance. In relation to the latter contention, MAMSI asserts that health insurance and automobile insurance are fundamentally different and that these differences provide evidence that § 19–507(b) applies only to automobile insurance. The gist of MAMSI's assertions are that subsection (b) of § 19–507 only "prescribes the limited terms on which an automobile insurer can make PIP benefits secondary" and "does not impose the same restrictions on approved contracts making health insurance or HMO benefits secondary."

Wu asserts that the legislative design and purpose of § 19–507, as well as this Court's interpretation of the statute in *Dutta v. State Farm,* 363 Md. 540, 769 A.2d 948 (2001), support the opposite conclusion. Wu posits that these authorities clearly establish that "PIP benefits cannot be coordinated by an auto insurer *or* health insurer unless the insured has given clear and unequivocal permission to do so in accordance

---

**4.** The terms "automobile insurer" and "motor vehicle insurer" are used interchangeably within this Opinion.

with the provisions of § 19–507." Furthermore, Wu asserts that the failure to apply § 19–507 to health insurers would render segments of that statute meaningless and lead to illogical and unreasonable results. Specifically, Wu asserts:

[MAMSI'S] contention that § 19–507 only governs motor vehicle insurance . . . would make entirely superfluous those provisions of § 19–507 that PIP benefits "shall be payable without regard to any collateral source of medical, hospital, or wage continuation benefits." Similarly, such an interpretation would make entirely irrelevant those provisions in subsection (b)(1) and (b)(2) of § 19–507 that expressly set forth the manner in which a health care provider and PIP insurer may legally coordinate their respective policies to provide for the non-duplication of benefits. Since a reduction in premiums can only be implemented upon the insured's coordination of her respective "policies," where an auto insurance policy exists, the other policy must be the healthcare insurance policy. There simply cannot be two auto insurance policies that would require coordination by the insured.

Wu directs the Court's attention to the administrative decision, *Maryland Ins. Admin. ex rel. G.P., Jr. v. MD–Individual Practice Ass'n*, OAH No. MIA–INS–34–200100024 (May 29, 2003), which she contends provides guidance as to how this Court should apply § 19–507 of the Insurance Article to health insurers.[5]

### III.

Subtitle 5 of the Insurance Article "sets forth the kinds of primary coverages that motor vehicle insurers are required to

---

5. This administrative decision addressed, only in dictum, the certified question. There, the administrative law judge suggested that under this Court's holding in *Dutta v. State Farm*, 363 Md. 540, 769 A.2d 948 (2001), HMOs are considered a collateral source of medical benefits. The administrative judge did not address, however, whether the restrictions applicable to automobile insurers under § 19–507 of the Insurance Article are also applicable to health insurers and HMOs. *Maryland Ins. Admin. ex rel. G.P., Jr. v. MD–Individual Practice Ass'n*, OAH No. MIA–INS–34–200100024 (May 29, 2003).

offer in Maryland policies." *MAIF v. Perry,* 356 Md. 668, 671, 741 A.2d 1114, 1115 (1999). One of the primary coverages is PIP benefits, as provided for in Md.Code (1995, 2006 Repl. Vol.), § § 19–505 to 19–508 of the Insurance Article. *Id.* The purpose of PIP benefits is described by Andrew Janquitto, in his treatise, ANDREW JANQUITTO, MARYLAND MOTORVEHICLE IN-SURANCE 478–79 (2d ed.1999). Mr. Janquitto writes:

> Nowhere does the State's paramount concern with providing compensation to victims of motor vehicle accidents manifest itself more clearly and unmistakably than in Subtitle 5 of Title 19 of the Insurance Article. That subtitle, among other things, requires that every policy of motor vehicle insurance issued, sold, or delivered in Maryland contain personal injury protection, known sometimes as "economic loss coverage" and more commonly as "PIP." A first-party coverage, PIP plays a central role in Maryland's comprehensive insurance scheme by providing medical, hospital, and disability benefits without regard to fault.

JANQUITTO, *supra,* at 478. Indeed, this Court has declared on numerous occasions that it is clear that PIP legislation was enacted in Maryland in order "to assure financial compensation to victims of motor vehicle accidents without regard to the fault of a named insured or other persons entitled to PIP benefits." *Dwayne Clay, M.D., P.C. v. GEICO,* 356 Md. 257, 265–66, 739 A.2d 5, 10 (1999) (quoting *Pennsylvania Nat'l Mut. v. Gartelman,* 288 Md. 151, 154, 416 A.2d 734, 736 (1980)); *see also Dutta,* 363 Md. at 547–48, 769 A.2d at 952 (explaining that the purpose behind the passage of PIP legislation in Maryland is to provide prompt financial compensation to victims of motor vehicle accidents "without regard to the fault of the named insured or other persons entitled to PIP benefits").

In *Dutta,* this Court examined § 19–507 of the Insurance Article, focusing primarily on subsection (a) of the statute. In that case, the petitioner, Dutta, filed a PIP claim for reimbursement of medical expenses that stemmed from injuries he incurred in an automobile accident. *Dutta,* 363 Md. at 544, 769 A.2d at 950–51. Dutta's PIP insurance carrier refused to

pay the reimbursement on the grounds that the bill was previously paid by the petitioner's HMO. *Dutta*, 363 Md. at 545, 769 A.2d at 951. Legal action ensued. *Id.*

When this Court considered the matter, we held that the PIP insurer was "statutorily mandated by section 19–507 to provide PIP benefits to petitioner regardless of the fact that [the petitioner had] also received health insurance benefits from his HMO...." *Dutta*, 363 Md. at 554, 769 A.2d at 956. The *Dutta* Court stated:

> The Legislature could not have expressed its intent any clearer—an insurer must pay PIP benefits *regardless of any collateral source of benefits—i.e.,* regardless of whether a health insurance provider, HMO, or other collateral source provides benefits.... If the Legislature had meant to exclude members of HMOs that provide collateral benefits from PIP coverage, language to that effect would have been included in either section 19–505, section 19–507, or section 19–513.
>
> \* \* \*
>
> [The PIP Insurer's] argument that [Dutta] cannot recover both PIP benefits and collateral medical and hospital benefits demonstrates complete disregard for the plain language of section 19–507.
>
> \* \* \*
>
> [A]utomobile insurers who provide services in Maryland are mandated to provide coverage for the medical, hospital, and disability benefits for individuals identified as first named insureds on their policies except if waived by the insured. The Legislature included mandatory language to require insurers to at least offer PIP coverage to potential insureds. The intent of the Legislature is clear—that unless waived by the insured, PIP benefits are to be provided to cover appropriate expenses arising out of a motor vehicle accident, which are incurred within a certain time period.

*Dutta*, 363 Md. at 551, 555, 769 A.2d at 954, 956–57.

The holding in *Dutta* makes clear that § 19–507 governs automobile insurers and that PIP benefits must be paid

when incurred, regardless of whether an insured has a collateral source of benefits. *Id.* This Court's opinion in *Dutta,* however, concerned only what § 19–507(a) requires of automobile insurers providing PIP coverage. *See Dutta,* 363 Md. at 549–51, 769 A.2d at 953–56. This Court in *Dutta,* did not address, and has not yet addressed, whether § 19–507(b) restricts or prohibits a health insurer or HMO from providing by contract that its health benefits are secondary to PIP benefits.

Because the answer to the question before us is not provided by precedent, the issue before this Court is an issue of first impression that requires us to construe § 19–507(b); hence, we are guided by the rules of statutory construction, which are well settled in Maryland. *Carroll v. Konits,* 400 Md. 167, 191, 929 A.2d 19, 34 (2007). We enumerated the rules in *Walzer v. Osborne,* 395 Md. 563, 571–73, 911 A.2d 427, 431–32 (2006), where we stated:

> The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature. As the Court has explained, to determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the Legislature is presumed to have meant what it said and said what it meant. When the statutory language is clear, we need not look beyond the statutory language to determine the Legislature's intent.

> . . .

> If the language of the statute is ambiguous, however, then courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment under consideration. We have said that there is an ambiguity within a statute when there exist two or more reasonable alternative interpretations of the statute. When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our

disposal. If the true legislative intent cannot readily be determined from the statutory language alone, however, we may, and often must, resort to other recognized indicia— among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.

*Id.* (citations omitted).

■ Applying the rules of statutory construction to this case, we hold that § 19–507 of the Insurance Article does not prohibit a health insurer or HMO from providing in its group or individual contracts of insurance or membership contracts that its contractual health benefits may be secondary to PIP benefits under an automobile insurance policy. We begin our analysis by looking, first, at the plain language of § 19–507 of the Insurance Article. Section 19–507(a) clearly provides when an auto insurer must pay the PIP benefits enumerated in § 19–505 of the Insurance Article. Section 19–507(b)(1) provides for the coordination of the required PIP benefits and collateral sources of benefits among "the insured," "insurers," and "policies" to provide for nonduplication of benefits. Section 19–507 does not define the terms "insured," "insurers," or "policies," nor does Md.Code (1995, 2006 Repl.Vol.), § 19–501 of the Insurance Article, which provides definitions for the relevant subtitle. Section 19–507(b) enumerates the right of the "named insured" to reject coordination of policies and nonduplication of benefits. Section 19–501(d) of the Insurance Article defines "named insured" as "the person denominated in the declarations in a *motor vehicle liability insurance policy.*" (Emphasis added.)

The Legislature's use of the term "insured," unmodified, along with the plural terms "insurers" and "policies" in § 19–507(b)(1) and use of the defined term "named insured" in

§ 19–507(b)(2), invites the question of whether the statute restricts only automobile insurers or restricts collateral insurers also, such as health insurers and HMOs.[6] Because we conclude that this aspect of § 19–507 is ambiguous, we seek to ascertain what the Legislature intended when enacting the statute. *See Stachowski v. Sysco*, 402 Md. 506, 517, 937 A.2d 195, 201 (2007) ("A statute is ambiguous where two or more reasonable interpretations exist.").

Chapter 73 of the Acts of 1972, which contained the section that was subsequently recodified as § 19–507 of the Insurance Article, enacted comprehensive amendments to the Insurance Code. The amendments included the addition of §§ 538 to 546, requiring mandatory PIP coverage for automobile insurance policies, in this State, under the subtitle "Motor Vehicle Casualty Insurance—Required Primary Coverage." Chapter 73 of the Acts of 1972 ("... to add new Sections 538 to 546 inclusive to said article and title under the new subtitle 35. Motor Vehicle Casualty Insurance—Required Primary Coverage" ...). The subtitle provides evidence that the Legislature, when enacting the new sections, intended to create obligations and restrictions on motor vehicle insurance carriers when providing casualty insurance, specifically the

---

**6.** The dissent points out that "[s]ubsection (b)(1), is, by its terms, '[s]ubject to Paragraph (2),'" and then relies on the Legislature's use of the plural terms "insurers" and "policies" in subsection (b)(1) when applying the restrictions set forth in subsection (b)(2), concluding that the restrictions of § 19–507(b)(2) apply to all carriers involved in a coordination of benefits. 411 Md. 166, 202–03, 983 A.2d 88, 109–10 (2009) (dissenting opinion). This conclusion, however, does not account for the fact that the Legislature switched from using the general term, "insured," when permitting coordination in subsection (b)(1), to a defined term, "named insured," when discussing the restrictions on coordination set forth in subsection (b)(2). In our view, the use of a more limited term, "named insured," which applies only to motor vehicle insurance policies, demonstrates the Legislature's intent that the restrictions on coordination apply only to motor vehicle insurance carriers who seek to coordinate PIP benefits with collateral sources of benefits. Had the Legislature intended to apply the restrictions set forth in § 19–507(b)(2) to insurers other than motor vehicle insurers, the Legislature would have used the more general term "insured," which the drafters used in § 19–507(b)(1). Thus, to resolve this ambiguity, we look to the legislative history and statutory scheme.

required primary coverages, one of which is PIP. *See Moore v. State,* 388 Md. 623, 635, 882 A.2d 256, 263 (2005) ("[T]he title of an enactment is an important indication of the General Assembly's intent."); *Kushell v. DNR,* 385 Md. 563, 577, 870 A.2d 186, 193 (2005) (explaining that when determining legislative intent, we "analyze [a] statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect"). Chapter 73 of the Acts of 1972, § 540 was originally codified at Md.Code (1957, 1979 Repl.Vol.), Article 48A, § 540, and subsequently recodified without substantive change at § 19–507 of the Insurance Article by Chapter 11 of the Acts of 1996. Subtitle 5 of Title 19, in which § 19–507 is contained, "was [written as part of] a comprehensive [1972] law that, among other things, ... required [motor vehicle insurance] policies to contain ... PIP coverage." *Perry,* 356 Md. at 674–75, 741 A.2d at 1117–18 (noting that "[t]he thrust of the 1972 law was to extend ... insurance protection, especially a limited amount of primary, no-fault benefits for wage loss and basic medical expenses.").

In addition, the first section of Subtitle 5, § 19–501, provides definitions for the subtitle and defines the "named insured" referenced in § § 19–505 and 19–507 as "the person denominated in the declarations in *a motor vehicle liability insurance policy.*" § 19–501(d) of the Insurance Article (emphasis added). The text of § 19–507 of the Insurance Article references § 19–505, which provides in pertinent part:

**Personal injury protection coverage—In general.**

(a) *Coverage required.*—Unless waived in accordance with § 19–506 of this subtitle, each insurer that issues, sells, or delivers **a motor vehicle liability insurance policy** in the State shall provide coverage for the medical, hospital and disability benefits described in this section for each of the following individuals:

(1) except for individuals specifically excluded under § 27–606 of this article:

(i) the first **named insured,** and any family member of the first named insured who resides in the first named insured's

household, who is injured in any motor vehicle accident, including an accident that involves an uninsured motor vehicle or a motor vehicle the identify of which cannot be ascertained; and

(ii) any other individual who is injured in a motor vehicle accident while using the insured motor vehicle with the express or implied permission of the **named insured.**

§ 19–505(a)(1) of the Insurance Article (emphasis added). While motor vehicle insurance is mentioned throughout §§ 19–505 and 19–507, neither section mentions health insurers nor HMOs. Accordingly, we discern that the title of the overall comprehensive Enactment and text of § 19–507, specifically its repeated cross-references to § 19–505, its use of the defined term "named insured" when enumerating the restrictions on coordination of benefits in § 19–507(b)(2), as well as its location within the Insurance Article, demonstrates that the Legislature intended the restrictions contained within subsection (b) of the statute to apply only to motor vehicle insurers, the named insured, and persons entitled to PIP benefits. In our view, the statute mandates that a motor vehicle insurance policy containing PIP benefits is the primary source of coverage for a person injured in an automobile accident. If, however, the insured agrees in writing to permit the motor vehicle insurer to coordinate with the insured's collateral insurers, the insurers may arrange for the motor vehicle policy to serve as a secondary source of coverage. *See* § 19–507(b)(i) of the Insurance Article.[7]

---

**7.** In *Appleman on Insurance Law,* Eileen Swarbrick provides an example of "coordination of benefits" in the context of automobile insurance policies. Swarbrick states:

For example, a party injured in an automobile accident may have both no-fault and health care policies, both of which provide the same types of benefits for medical services. The primary coverage pays for all of the losses up to the applicable policy limits. The second policy comes into play only when these limits are exhausted or inadequate.

Eileen Swarbrick, *Automobile Insurance, in* APPLEMAN ON INSURANCE § 158.1 (2d ed.2004). Section 19–507(b) of the Insurance Article governs only when an automobile insurance policy providing PIP

Furthermore, other aspects of the legislative history of § 19–507(b) of the Insurance Article support our interpretation that the Legislature intended to establish a mechanism to allow insureds to make PIP benefits secondary to a collateral insurer. *See Walzer*, 395 Md. at 573, 911 A.2d at 432 (identifying legislative history as one of the "resources and tools of statutory construction"). Chapter 73 of the Acts of 1972 enacted the statutory framework for PIP coverage. Section 540 of Chapter 73 provided that PIP coverage is payable regardless of fault or of any collateral sources of medical, hospital, or wage continuation benefits. Thus, the Legislature established that PIP is the primary source of recovery where an expense is incurred, regardless of fault, arising out of a motor vehicle accident.

Chapter 771 of the Acts of 1973 amended § 540, adding the coordination of benefits language.[8]

Where the insured has coverage for both the benefits required under Section 539 and the collateral benefits, the insurer or insurers may coordinate the policies to provide for non-duplication of such benefits; subject, however, to appropriate reductions in premiums for one or both of said coverages approved by the Insurance Commissioner, and the named insured shall have the right to elect or reject the coordination of policies and non-duplication of benefits. If the insured elects to coordinate, he shall indicate in writing which policy is to become primary.

*Id.* This language addresses the fact that some insureds have alternative medical, wage replacement, and hospital benefits available and thus do not require the mandatory PIP benefits. The coordination of benefits language allows the PIP carrier to pay its benefits secondary to another line of insurance if the

---

coverage may coordinate to make its coverage secondary to a primary carrier.

**8.** The Legislature subsequently amended § 540, in Chapter 161 of the Acts of 1974, and Chapter 11 of the Acts of 1996. The Legislature specifically noted that the changes were grammatical and for the purpose of an overall revision of the Code, respectively, and were not intended to be substantive.

insured so desires, thus potentially availing the insured a discount on one or both lines of insurance. In the absence of such an agreement between the named insured of an automobile policy and the PIP carrier to make another insurance primary, the PIP coverage remains primary to the collateral insurance as required by the language of § 19–507(a).

Section 19–507(b)'s language requiring the insured's consent to the coordination of policies and the non-duplication of benefits applies only when the insured seeks to make a collateral benefit primary to PIP coverage. As we explain here and have explained previously, § 19 of the Insurance Article focuses on automobile insurance carriers and their insureds, not HMOs or other insurance carriers. *See Perry*, 356 Md. at 674–75, 741 A.2d at 1117–19. Section 19–507(b)(2) established conditions that an automobile insurer must meet before the insurer can agree to make its statutory obligation to pay PIP benefits secondary to benefits provided by a collateral source. The PIP carrier's obligation under § 19–507(a), as the primary payor of benefits, prevents the carrier from unilaterally refusing to pay benefits unless the "named insured" consents under § 19–507(b)(2). *See Dutta*, 363 Md. at 549–551, 554, 769 A.2d at 954–55. Section 19–507(b) does not, however, restrict the efforts of health insurers or HMOs to coordinate benefits or otherwise avoid duplicate payments.

The existence and location of separate portions of the Maryland Code that specifically regulate health insurers and HMOs provide additional support for the holding that § 19–507(b) of the Insurance Article does not restrict health insurers or HMOs. *See Insurance Co. of N. Amer. v. Aufenkamp*, 291 Md. 495, 506, 435 A.2d 774, 780 (1981) (noting that while there is some overlap that inherently exists between the coverage provided by various types of insurance, "[t]he very structure of the insurance code leads [to the conclusion] that the various types of insurance defined there ... constitute various categories of insurance which for the most part are mutually exclusive"). Maryland HMOs are regulated by the Maryland Health Maintenance Organization Act, codified with amendments at Md.Code (1982, 2005 Repl.Vol.), §§ 19–701 to

19–735 of the Health–General Article ("HMO Act"). Section 19–706(c) of the Health–General Article states that "[e]xcept as otherwise provided in this subtitle, a health maintenance organization is not subject to the insurance laws of this State." Section 19–706 then enumerates all the specific subsections and subtitles of the Insurance Article that apply to Maryland HMOs. Notably, § 19–507 of the Insurance Article is not listed.

The HMO Act also contains its own authorization for coordination provisions in HMO contracts. Section 19–713.1(a) of the Health–General Article provides:

> *Nonduplication or coordination of coverage provisions—In general.*—A group contract between a health maintenance organization and its subscribers or a group of subscribers may contain nonduplication provisions or provisions to coordinate the coverage with subscriber contracts of other health maintenance organizations, health insurance policies, including those of nonprofit health service plans, and other established programs under which the subscriber or member may make a claim.

*Id.* Sections 19–713.1(d) and (e) of the Health–General Article prohibit an HMO from subrogating PIP benefits. These subsections provide:

> (d) *Subrogation provisions—Authorized.*—Notwithstanding § 19–701(g)(3) of this subtitle, a contract between a health maintenance organization and its subscribers or a group of subscribers may contain a provision allowing the health maintenance organization to be subrogated to a cause of action that a subscriber has against another person....
>
> (e) *Same—Recovery under personal injury protection policy.*—Subsection (d) of this section does not allow a contract between a health maintenance organization and its subscribers or a group of subscribers to contain a provision allowing the health maintenance organization to recover any payments made to a subscriber under a personal injury protection policy.

§ 19–713.1 of the Health–General Article. This prohibition appears only in the Health–General Article applicable to

HMOs. It is logical to conclude that had the General Assembly intended to place additional restrictions on HMO contracts, it would have done so within Title 19 of the Health–General Article, which specifically governs HMOs. Because the General Assembly chose not to do so, it is reasonable to conclude that no additional restrictions exist with respect to HMOs and coordination provisions in those policies. *See Comptroller v. Science Applications*, 405 Md. 185, 198, 950 A.2d 766, 773 (2008) ("[T]he Legislature is presumed to have meant what it said and said what it meant.") (quoting *Tribbitt v. State*, 403 Md. 638, 646, 943 A.2d 1260, 1264 (2008)).

The Health Insurance Article included within the Maryland Insurance Article also contains a specific provision relating to non-duplication and coordination provisions in health insurance policies. Md.Code (1995, 2006 Repl.Vol.), § 15–104(b) of the Insurance Article provides:

*Authorized.*—In accordance with regulations that the Commissioner adopts, the Commissioner shall allow health insurance policies and policies of nonprofit health service plans to contain nonduplication provisions or provisions to coordinate health benefits with:

(1) other health insurance policies, including commercial individual, group, and blanket policies and policies of nonprofit health service plans

(2) subscriber contacts that are issued by health maintenance organizations; and

(3) other established programs under which the insured may make a claim.

*Id.* Because the Legislature provided in this section, located in the Health Insurance subtitle of the Insurance Article, that a health insurance policy may contain nonduplication provisions and coordination provisions, it would be illogical for this Court to conclude that the Legislature intended for § 19–507(b) of the Motor Vehicle subtitle of the Insurance Article to restrict or prevent the exclusions of such provisions within health insurance policies. *See Suter v. Stuckey*, 402 Md. 211, 231, 935 A.2d 731, 743 (2007) ("In the case where two statutes

apply to the same situation, we first attempt to reconcile them, and then, if the statutes remain contradictory, the more specific statute controls."); *see also A.S. Abell Pub. Co. v. Mezzanote,* 297 Md. 26, 40, 464 A.2d 1068, 1075 (1983) ("Ordinarily, a specific enactment prevails over an incompatible general enactment in the same or another statute.").

Contrary to the arguments advanced by Wu, our decision that § 19–507 of the Insurance Article does not restrict or prohibit HMOs or health insurers from providing by contract that their health benefits are secondary to PIP benefits does not render superfluous those provisions of § 19–507(b) that permit an insured to elect to coordinate policies or reject the coordination of policies. For example, an individual may be covered by two or more motor vehicle policies that provide PIP coverage. *See Bishop v. State Farm,* 360 Md. 225, 236, 757 A.2d 783, 789 (2000) ("A person injured in an automobile accident could be eligible for PIP benefits from two or more sources....") (quoting *Perry,* 356 Md. at 676, 741 A.2d at 1118); *see also* JANQUITTO, *supra,* at 556 ("A person may be insured by two or more motor vehicle policies...."). In addition, § 19–507(b) sets forth the terms in which motor vehicle insurers may coordinate their policies with one another or with other insurance policies and provides the insured the right to agree to such coordination in writing or to reject such coordination. What § 19–507(b) does not do is restrict when a health insurer or HMO may attempt to coordinate its policy. *Cf. Smith v. Physicians Health Plan,* 444 Mich. 743, 514 N.W.2d 150, 155 (1994) (concluding that under a similar no-fault automobile insurance act, that "[although] the consumer has the choice whether to coordinate coverage on the no-fault side of his [or her] insurance ... [t]here is not a corresponding guarantee that the selection of an uncoordinated no-fault insurance policy will dictate the terms of whatever other insurance one might have").

**CERTIFIED QUESTION OF LAW ANSWERED AS SET FORTH ABOVE COSTS TO BE EQUALLY DIVIDED BY THE PARTIES.**

BELL, C.J., Dissents.

Dissenting Opinion by BELL, C.J.

## I.

The majority holds that Maryland Code (1995, 2006 Repl. Vol.) § 19–507[1] of the Insurance Law Article does not prohibit a health insurer or HMO from providing, and thus requiring, in its group or individual contracts of insurance or membership contracts that its contractual health benefits are secondary to PIP benefits under an automobile liability insurance

---

1. Maryland Code (1995, 2006 Repl.Vol.) § 19–507 of the Insurance Law Article provides:

   "*Personal injury protection coverage.* When benefits payable; coordination of policies; surcharge; subrogation.
   "(a) *When benefits payable.*—The benefits described in § 19–505 of this subtitle shall be payable without regard to:
   (1) the fault or nonfault of the named insured or the recipient of benefits in causing or contributing to the motor vehicle accident; and
   (2) any collateral source of medical, hospital, or wage continuation benefits.
   "(b) *Coordination of policies.*—
   "(1) Subject to paragraph (2) of this subsection, if the insured has both coverage for the benefits described in § 19–505 of this subtitle and a collateral source of medical, hospital, or wage continuation benefits, the insurer or insurers may coordinate the policies to provide for nonduplication of benefits, subject to appropriate reductions in premiums for one or both of the policies approved by the Commissioner."
   "(1) The named insured may:
   (i) elect to coordinate the policies by indicating in writing which policy is to be the primary policy; or
   (ii) reject the coordination of policies and nonduplication of benefits."
   "(c) *Surcharge prohibited.*—An insurer that issues a policy that contains the coverage described in § 19–505 of this subtitle may not impose a surcharge for a claim or payment made under that coverage and, at the time the policy is issued, shall notify the policyholder in writing that a surcharge may not be imposed for a claim or payment made under that coverage.
   "(d) *Subrogation.*—An insurer that provides the benefits described in § 19–505 of this subtitle does not have a right of subrogation and does not have a claim against any other person or insurer to recover any benefits paid because of the alleged fault of the other person in causing or contributing to a motor vehicle accident."
   By Chapter 378 of the Acts of 2009, effective January 1, 2010, subsection (c) was amended to prohibit, in addition to "surcharging," the

policy. 411 Md. at 177, 983 A.2d at 94–95 (2009). In concluding that when the General Assembly enacted § 19–507, it was only concerned with automobile insurance policies and not collateral insurance policies, the majority was persuaded by the facts that the General Assembly separately considered and codified legislation that governs automobile insurance policies and that governs healthcare providers and health maintenance organizations. That § 19–507 is located in Title 19, "Motor Vehicle Casualty Insurance—Required Primary Coverage," Subtitle 5, Motor Vehicle Insurance—Primary Coverage, health insurance regulation in this state is pursuant to provisions found in Title 15, "Health Insurance," of the Insurance Article, and Maryland health maintenance organizations are regulated by the Maryland Health Maintenance Organization Act, which is located in Title 19, Subtitle 7 of the Health–General Article, it says, *id.* at 178–79, 182–84, 983 A.2d at 95–96, 97–98 (2009), demonstrate that the Legislature intended the obligations and restrictions it contains to apply only to automobile insurers and to the persons entitled to benefits as a result of having an insurance policy with those insurers. *Id.* at 178, 983 A.2d at 95.

In that regard, as to the former, the majority points out, § 19–501, the "definitions" section for the Subtitle, defines "named insured," referenced in §§ 19–505 [2] and 19–507, as

"retiering" of the policy, by adding "or retier the policy" and "and the policy may not be retiered."

**2.** The relevant parts of § 19–505 provide:

*"Personal injury protection coverage.—In general.*
"(a) Coverage required.—Unless waived in accordance with § 19–506 of this subtitle, each insurer that issues, sells, or delivers a motor vehicle liability insurance policy in the State shall provide coverage for the medical, hospital, and disability benefits described in this section . . .

\*　　\*　　\*

"(a) Minimum benefits required.—
"(2) The minimum medical, hospital, and disability benefits provided by an insurer under this section shall include up to $2,500 for:

"the person denominated in the declarations in a motor vehicle liability insurance policy." *Id.* It finds particularly significant, moreover, that § 19–507(b) uses that term,[3] that only motor

"(i) payment of all reasonable and necessary expenses that arise from a motor vehicle accident and that are incurred within 3 years after the accident for necessary prosthetic devices and ambulance, dental, funeral, hospital, medical, professional nursing, surgical, and x-ray services;

"(ii) payment of benefits for 85% of income lost:

1.   within 3 years after, and resulting from, a motor vehicle accident; and

2.   by an injured individual who was earning or producing income when the accident occurred;   and

"(iii) payments made in reimbursement of reasonable and necessary expenses incurred within 3 years after a motor vehicle accident for essential services ordinarily performed for the care and maintenance of the family or family household by an individual who was injured in the accident and not earning or producing income when the accident occurred.

3.   The use in § 19–507(b) of the term, "named insured," is particularly important to the majority's analysis because of the Legislature's substitution of it for the more general, "insurer."   It reasons:

"[T]he use of a more limited term, 'named insured,' which applies only to motor vehicle insurance policies, demonstrates the Legislature's intent that the restrictions on coordination apply only to motor vehicle insurance carriers who seek to coordinate PIP benefits with collateral sources of benefits.   Had the Legislature intended to apply the restrictions set forth in § 19–507(b)(2) to insurers other than motor vehicle liability insurers, the Legislature would have used the more general term "insured," which the drafters used in § 19–507(b)(1).   Thus, to resolve this ambiguity, we look to the legislative history and statutory scheme."

411 Md. at 178 n. 6, 983 A.2d at 95 n. 6.   It faults my analysis for disregarding the substitution and, in any event, not appreciating or giving effect to its significance.

The majority misses the point of § 19–507(b)(2).   Whichever term is used, the more general or the more specific, because, as the majority points out, we are dealing with a provision regulating motor vehicle insurance, the provision must be referring to the person insured.   I did not disregard the change in the language in that regard; I do not think that is the proper focus or significance of the provision.   What cannot be gainsaid is that subsection (b)(1), by providing for coordination "if the insured has both coverage for the benefits described in § 19–505 of this subtitle and a collateral source of medical, hospital, or wage continuation benefits," addresses the situation in which the "named insured" under the automobile policy has, in addition to that policy, a collateral source of benefits policy, *i.e.* a health insurance policy or is a member of an HMO. As important, it contemplates that the policy

vehicle insurance is mentioned in §§ 19–505 and 19–507 and that neither section mentions health insurers or health maintenance organizations. *Id.* at 180, 983 A.2d at 96.

Turning to the latter, the majority notes that Maryland Code (1982, 2005 Repl.Vol.) § 19–706(a) of the Health General Article states that "except as otherwise provided in this subtitle, a health maintenance organization is not subject to the insurance laws of this State." *Id.* at 183, 983 A.2d at 98. Emphasizing this section and pointing out that "[s]ection 19–706 then enumerates all the specific subsections and subtitles of the Insurance Article that apply to Maryland HMOs," *id.*, while not referencing § 19–507 of the Insurance Article at all, the majority asserts that "it is logical to conclude that had the General Assembly intended to place additional restrictions on HMO contracts, it would have done so within Title 19 of the Health–General Article, which specifically governs HMOs." *Id.* at 184, 983 A.2d at 98. As indicated, the majority also relies on the facts that the statutes regulating health insurance in this state are found in Title 15, "Health Insurance," of the Insurance Article, *id.* at 184–85, 983 A.2d at 99, § 15–104(b) of which expressly addresses non-duplication or coordination of benefits by health insurers [4] and that the authority of health maintenance organizations to coordinate benefits is prescribed

---

under which those collateral benefits are provided may be issued by the same or a different insurer. We know this to be so because subsection (b)(1) refers to "insurer or insurers" and "one or both of the policies."

Although this also answers the majority's automobile insurance argument, what Wu argues does so more directly:

"[S]uch an interpretation would make entirely irrelevant those provisions in subsection (b)(1) and (b)(2) of § 19–507 that expressly set forth the manner in which a health care provider and PIP insurer may legally coordinate their respective policies to provide for the non-duplication of benefits. Since a reduction in premiums can only be implemented upon the insured's coordination of her respective 'policies,' where an auto insurance policy exists, the other policy must be the healthcare insurance policy. There simply cannot be two auto insurance policies that would require coordination by the insured."

**4.** Section 15–104(b) of the Health Insurance Article provides:

in § 19–713.1 of the Health–General Article.[5] 411 Md. at 183, 983 A.2d at 98.

I do not believe that the majority's analysis is correct and, so, I dissent. A significant issue in this appeal, and my focus, is whether § 19–507(b)'s use of the plural terms, "insurers" and "policies," places the same restrictions on collateral insurers, such as health insurers and health maintenance organizations (HMOs) as it does on automobile insurers.

The issue in this case had its genesis in an automobile accident in which the respondent, Kuei–I Wu (Wu), was involved, and was injured, while she was a full-time student at the University of Maryland. In addition to the automobile insurance she was mandated to have, see § 19–505(a), Wu was insured by the petitioner, MAMSI Life and Health Insurance Co. ("MLH"), under a health insurance plan. The Preferred Provider Option ("PPO") plan, to which she belonged, paid participating health care providers, in exchange for medical care provided to its members for "Covered Services," a negotiated rate, which the providers agreed to accept as full payment. Wu's health insurance policy contained a Coordination

---

"*Authorized.*—In accordance with regulations that the Commissioner adopts, the Commissioner shall allow health insurance policies and policies of nonprofit health service plans to contain nonduplication provisions or provisions to coordinate coverage with:

"(1) other health insurance policies, including commercial individual, group, and blanket policies and policies of nonprofit health service plans;

"(2) subscriber contracts that are issued by health maintenance organizations; and

"(3) other established programs under which the insured may make a claim."

5. Section 19–713.1(a) of the Health—General Article provides:

"*Nonduplication or coordination of coverage provisions—In general.*— A contract between a health maintenance organization and its subscribers or a group of subscribers may contain nonduplication provisions or provisions to coordinate the coverage with subscriber contracts of other health maintenance organizations, health insurance policies, including those of nonprofit health service plans, and with other established programs under which the subscriber or member may make a claim."

of Benefits provision. It expressly excluded consideration of any no-fault automobile insurance payments, such as PIP, in the application of the Coordination of Benefits procedures. Nevertheless, Wu alleges, "in a separate document known as the Provider Manual for Physicians and Practitioners, MAMSI illegally directs all providers within its healthcare plans that when the patient has been involved in an automobile accident, the providers must collect PIP benefits from the patient's automobile insurers first, before submitting any claims to MAMSI for payment." As a result, she maintains, the petitioner paid the participating healthcare providers for services rendered to her only after her PIP benefits were exhausted. Believing the Provider Manual for Physicians and Practitioners and the policy of the petitioner reflected in it to be in direct violation of the directive in § 19–507 of the Insurance Article that PIP benefits "shall be payable without regard to ... any collateral source of medical, hospital, or wage continuation benefits," Wu filed, in the Circuit Court for Baltimore County and against the petitioner and its parent companies, a class action complaint.

The case having been transferred to the Federal District Court and the dispositive issue having been determined to "center[ ] on whether the terms of section 19–507 apply only to automobile insurance carriers and whether the reasoning of *Dutta v. State Farm Insurance Co.*, 363 Md. 540, 769 A.2d 948 ( [ ] 2001), can be extended to healthcare companies or HMOs," the District Judge decided to certify that question to this Court. The actual question certified was the following:

"Does Maryland Code, Insurance Article § 19–507 prohibit or restrict a Maryland health insurer or a Maryland health maintenance organization from providing in its group or individual contracts of insurance or membership contracts that its contractual health benefits may be secondary to Personal Injury Protection ('PIP') benefits under an automobile liability insurance policy where the automobile liability insurer is legally obligated to provide benefits for healthcare expenses?"

## II

A statute authorizing Personal Injury Protection coverage was first enacted by the Maryland Legislature in 1972, as a part of the Insurance Code. See Chapter 73 of the Acts of 1972, which was codified as Article 48A and, in particular, § 540 of that Article, the predecessor of § 19–507. Its purpose was "to offer those injured in an 'incident' with an automobile ... 'quick' no-fault compensation for medical bills and lost wages up to a minimum amount...." *Dutta, supra,* 363 Md. at 547, 769 A.2d at 952.

Prior to the passage of House Bill 444, the bill which was to become Chapter 73 of the Acts of 1972, and, thus, before mandatory PIP coverage became law, at a meeting of the Special Committee on No–Fault Insurance, a committee created by the Legislative Council and charged with studying and considering no-fault insurance, representatives of organized labor expressed concern with regard to the "effect of the no-fault insurance upon the [then] previously negotiated accident and health plans included in labor contracts." They were concerned specifically that:

"If the no-fault benefits were secondary to the accident and health benefits, then the worker would be paying for automobile insurance which he could never collect. If the no-fault benefits were primary, then the worker was suffering a payroll deduction with no benefit. This problem would have to be resolved before full support by organized labor could be given to a no-fault plan."

*See Report of the Special Committee on No–Fault Insurance* (Jan. 31, 1972).

Subsequently, when the legislation was passed, the applicable provision related to, and governing, no-fault insurance benefits and collateral benefits, § 540, provided:

"The benefits required under § 539 of this article shall be payable without regard to the fault or nonfault of the named insured or the recipient in causing or contributing to the accident, and without regard to any collateral source of medical, hospital, or wage continuation benefits."

This provision has undergone a number of amendments, however, the most notable of which provided for coordination of benefits. In 1973, a second sentence was added to § 540, as follows:

"Where the insured has coverage for both benefits required under § 539 and the collateral benefits, the insurer or insurers may coordinate the policies to provide for nonduplication of such benefits; subject, however, to appropriate reductions in premiums for one or both of said coverages approved by the Insurance Commissioner, and the named insured shall have the right to elect or reject the coordination of policies and nonduplication of benefits,[6] If the insured elects to coordinate, he shall indicate in writing which policy is to become primary."

In 1989, the General Assembly amended § 540, in relevant part, to read:

"(a) The benefits *described* under § 539 of this *subtitle* shall be payable without regard to:

(1) The fault or nonfault of the named insured or the recipient in causing and contributing to the accident; and

(2) Any collateral source of medical, hospital, or wage continuation benefits.

(B)(1) *Subject to Paragraph (2) of this subsection, where* the insured has coverage for both the benefits *described* under § 539 *of this subtitle* and the collateral benefits, the insurer or insurers may coordinate the policies to provide for nonduplication of *the* benefits, *subject* to appropriate

---

6. In 1974, the General Assembly amended § 540 to make a grammatical change, replacing a comma with a period after the word "benefits" and before "If the insured elects to coordinate, he shall indicate in writing which policy is to become primary." In 1984, the General Assembly deleted the words "pursuant to" and replaced them with the word "under" prior to reference to " § 539" so that it read, "an insurer paying benefits *under* § 539 of this Article shall have no right of subrogation and no claim against any other person or insurer to recover any such benefits by reason of the alleged fault of such other person in causing or contributing to the accident."

reductions in premiums for one or both of said coverages approved by the Commissioner.

(2)(I) The named insured shall have the right to elect or reject the coordination of policies and nonduplication of benefits.

(II) If the insured elects to coordinate *policies, the insured* shall indicate in writing which policy is to become primary."

In 1996, the Legislature repealed Article 48A and did a "Plain English" recodification of the Insurance Article, including to the Motor Vehicle Insurance Subtitle. *See* 1996 Maryland Laws, Chapter 11. The goal of the recodification was clarity and conciseness, as the "Overview" of House Bill No. 11 recites:

"The goal in revising is to rewrite the law more clearly and concisely without making any substantive changes. Where the legislative intent is clear, a revision will reconcile inconsistent provisions, delete obsolete provisions, and fill gaps in the law. Thus, although the language of a revision differs from the source statute, the legislative intent does not change...."

*See House Bill 11 Overview* (dated Jan. 11, 1996). Therefore, consistently and to be sure, the prior references in § 19–507 to "the collateral benefits" were modified to references to "collateral source of medical, hospital, or wage continuation benefits," and § 19–513(b) was amended to include the word "insurance" after "motor vehicle liability" to make clear and consistent within the Motor Vehicle Insurance subtitle the kinds of policies being addressed. The recodification did not change, or attempt to change, the reference in § 19–507(a) and (b) to, or any application § 19–507 was intended to have on, insurance policies and benefits other than motor vehicle insurance policies and the benefits flowing from them. Accordingly and in short, it did not, in express terms, restrict the application of § 19–507 to only "motor insurers" or "motor policies."

## III

Section 19–507, to be sure, does concern automobile insurance coverage, specifically, personal injury protection (PIP), a required benefit payable in respect of such policies. This is clear from the caption of the statute and by its reference to § 19–505, which describes the PIP benefits, including that their inclusion in automobile policies is required and what the minimum benefits are required to be. Subsection (a) of § 19–507 prescribes when the PIP benefits are to be payable, *i.e.* without regard to fault or the availability of collateral benefits.

But § 19–507 addresses and concerns more than automobile insurance and PIP benefits; it recognizes that "medical, hospital, or wage continuation benefits" also may exist and that those benefits may duplicate the benefits of the motor vehicle insurance. To address this latter potential, § 19–507(b) provides for coordination of benefits to prevent duplication of benefits, "subject, however, to appropriate reductions in premiums," and to the named insured's right to "reject the coordination of policies and nonduplication of benefits." To that extent, therefore, by its express terms, when the coordination of benefits is between collateral benefits, medical, hospital and wage continuation, and those of an automobile insurance policy, it is § 19–507 that governs. Neither § 15–104 nor Health–General § 19–713.1(a) provides, as § 19–507 does,[7] for coordination among policies that are not the same kind of policy that is being regulated. *See* § 15–104(b)(1), (2) and (3) and § 19–713.1(a) ("coverage with subscriber contracts, health maintenance organizations, health insurance policies, including nonprofit health service plans and with other established programs under which the subscriber or member may make a claim."). One thing is certain, neither references automobile

---

7. The majority is wrong when it says that § 19–507 does not mention health insurers or HMOs. I concede that neither is mentioned by its statutory reference, but I submit that both are nevertheless addressed, and therefore covered, by the reference in § 19–507(b) to "collateral sources." It is clear that, by so doing, § 19–507 was referring to policies or plans of health insurers or HMOs; indeed, it could mean nothing else.

policies. And § 19–507(b)(2), in clear and unambiguous terms, make clear who will drive the decision to coordinate the collateral benefits policies and the automobile policy—the named insured.

To answer the district court's certified question requires us to engage in statutory interpretation, the starting point of which is to determine the intention of the Legislature in enacting it. *Design Kitchen & Baths v. Lagos,* 388 Md. 718, 728, 882 A.2d 817, 823 (2005); *Mayor of Balt. v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000). Indeed, "ascertaining and carrying out the real intention of the Legislature," is the cardinal rule of statutory construction. *Mazor v. Department of Correction,* 279 Md. 355, 360, 369 A.2d 82, 86 (1977) citing *State v. Fabritz,* 276 Md. 416, 421, 348 A.2d 275, 278 (1975); *Fairchild v. Maritime Air Service, Ltd.,* 274 Md. 181, 185, 333 A.2d 313, 315–16 (1975); *Purifoy v. Mercantile—Safe Deposit & Trust Co.,* 273 Md. 58, 65, 327 A.2d 483, 487 (1974). When interpreting a statute, we give the words the Legislature used their ordinary and natural meaning. *Chase, supra,* 360 Md. at 128, 756 A.2d at 991, citing *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995); *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448, 451 (1994); *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 755 (1993); *Harris v. State,* 331 Md. 137, 145–46, 626 A.2d 946, 950 (1993). Where the words of a statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, the Court will give effect to the statute as the language is written, *Moore v. Miley,* 372 Md. 663, 677, 814 A.2d 557, 566 (2003), neither adding nor deleting language so as to "reflect an intent not evidenced in that language," *Condon, supra,* 332 Md. at 491, 632 A.2d at 758, nor construing it with " 'forced or subtle interpretations' that limit or extend its application." *Id.* (quoting *Tucker v. Fireman's Fund Insurance Co.,* 308 Md. 69, 73, 517 A.2d 730, 732 (1986)).

Section 19–507(b) is clear and unambiguous. There is nothing about, or in the language, or context, that indicates or suggests the contrary. The statute applies by its terms to PIP coverage and collateral source medical, hospital or wage

continuation benefits when the insured has "both coverage." Coordination by the insurers is permitted—"the insurer or insurers may coordinate" [8]—but that is made subject to the named insured's election to coordinate policies or reject that option.

There are, as we have seen, coordination provisions applicable to health insurance, § 15–104(b), and health maintenance organizations, Health–General § 19–713.1. As we also have seen, those provisions do not address automobile insurance policies as among those to be coordinated. Indeed, they address multiple policies of the same kind, providing the same or largely the same benefits, issued by other health organizations, such as "nonprofit health service plans," "health maintenance organizations" or "other established programs under which the insured may make a claim." Because they do not address coordination of PIP and collateral benefits, neither provision trumps the named insured's option, prescribed by § 19–507(b)(2). The majority's analysis and holding does just that. In so doing, it has failed to "read [the statutes] together, *State v. Bricker,* 321 Md. 86, 93, 581 A.2d 9, 12 (1990), *i.e.,* interpret [them] with reference to one another, *[Farmers & Merchants Bank v.] Schlossberg,* 306 Md. [48,] 61, 507 A.2d [172,] 178 [(1986)]; *Bridges v. Nicely,* 304 Md. 1, 10, 497 A.2d 142, 146 (1985), and harmonize[ them], to the extent possible, both with each other and with other provisions of the statutory scheme. *Balt[imore] Gas & Elec[tric Co. v. Public Serv. Commission],* 305 Md. [145] at 157, 501 A.2d [1307] at 1313 [(1986)]." *Government Employees Ins. Co. and GEICO v. Insurance Comm'r,* 332 Md. 124, 132–33, 630 A.2d 713, 717–18 (1993). The majority also has failed to heed the admonition not to read either statute so as to render the other, or any portion of it, meaningless, surplusage, superfluous or nugatory. *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992); *D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578 A.2d

---

**8.** Use of both the singular and the plural in subsection (b) in connection with who may coordinate the policies is interesting and logical. It recognizes that the same or different insurers may carry the motor insurance and the collateral insurance.

198

1177, 1179 (1990); *Kindley v. Governor of Md.,* 289 Md. 620, 625, 426 A.2d 908, 912 (1981); *Moberly v. Herboldsheimer,* 276 Md. 211, 217, 345 A.2d 855, 858 (1975). This is especially egregious in this case because the Legislature expressly has provided in § 19–507(b)(2) for an election by the named automobile insured, even in the face of the statute's recognition that the insured could hold both an automobile policy and a health insurance policy providing duplicate benefits.

*Dutta, supra,* is instructive on this point. There, this Court was presented with the question, whether "the PIP coverage at issue require[d] State Farm to pay for petitioner's medical treatment, even though petitioner's health care provider and/or a third party, tortfeasor, actually paid the medical bills." *Id.,* 363 Md. at 543, 769 A.2d at 949. The issue arose when Dutta, who both had personal automobile insurance with PIP coverage and was a member of an HMO through his employer, was injured as a result of an automobile accident in which he was involved. He was treated in the emergency room of the hospital at which he had been treated for a recent heart attack and, although he signed a Consent to Treat form, in which he agreed to pay, the hospital sought, and received payment from Dutta's HMO, whose information it had on record. Dutta filed a claim with his automobile insurer for expenses incurred relating to his emergency room treatment. The insurer refused to pay the amount paid by Dutta's HMO, prompting Dutta to file suit. The Circuit Court for Montgomery County answered the question of the insurer's liability for the PIP payments in the negative, holding for the insurer. It reasoned:

"Okay. I have had occasion to review all of the pleadings and to consider the arguments of Counsel, and while it does appear to me that this is somewhat unfair I have to say that I end up being more persuaded by the logic of Mr. Redmond's [State Farm's attorney] arguments in that I don't believe that the expense in this case was an expense that Dr. Dutta incurred within the meaning of the statute, and therefore, I do not believe that there is an obligation for the PIP carrier to pay it. My sympathies are with you, but

logic tells me that Mr. Redmond is probably correct and that this is what the legislature had intended."

*Id.,* 363 Md. at 546, 769 A.2d at 951.

This Court answered the issue before it in the affirmative, holding that "the Circuit Court erred in finding that the expenses arising out of the medical treatment petitioner received at [the] . . . [h]ospital, which was initially paid for by his HMO, were not an incurred expense by petitioner for which he was entitled to recover from his PIP coverage." *Id.,* 363 Md. at 563, 769 A.2d at 961–62. This Court reasoned:

> "The mandatory language of section 19–507(a) emphasizes that petitioner can recover from his HMO . . ., as well as PIP benefits from his automobile insurer, State Farm. 'The benefits described in § 19–505 of this subtitle shall be payable without regard to . . . any collateral source of medical, hospital, or wage continuation benefits.' The Legislature could not have expressed its intent any clearer—an insurer must pay PIP benefits regardless of any collateral source of benefits—i.e., regardless of whether a health insurance provider, HMO, or other collateral source provides benefits. [The HMO's] coverage of petitioner's medical bills for his treatment at [the] [h]ospital is exactly this— a collateral source of medical and hospital benefits. If the Legislature had meant to include members of HMOs that provide collateral benefits from PIP coverage, language to that effect would have been included in either section 19–505, section 19–507, or section 19–513. To interpret this language in any other way would render section 19–507(a)(2) meaningless. . . . [The insurer's] argument that petitioner cannot recover both PIP benefits and collateral medical and hospital benefits demonstrates complete disregard for the plain language of section 19–507."

*Id.,* 363 Md. at 550–51, 769 A.2d at 954. (citations and footnotes omitted).

The *Dutta* Court did not end its analysis there; rather, it proceeded to provide another reason that the majority is wrong.

## IV

This Court consistently has held that exclusions from statutorily mandated insurance coverage not expressly authorized by the Legislature generally will not be recognized. *Dutta, supra,* 363 Md. at 552, 769 A.2d at 955. *See also, Enter. Leasing Co. v. Allstate Ins. Co.,* 341 Md. 541, 547, 671 A.2d 509, 512 (1996) ("Where the Legislature has mandated insurance coverage, this Court will not create exclusions that are not specifically set out in the statute"); *Van Horn v. Atlantic Mut.,* 334 Md. 669, 686, 641 A.2d 195, 203 (1994) ("this Court has generally held invalid insurance policy limitations, exclusions and exceptions to the statutorily required coverages which were not expressly authorized by the Legislature"); *Allstate Ins. Co. v. Hart,* 327 Md. 526, 531–532, 611 A.2d 100, 102 (1992); *Gable v. Colonial Ins. Co.,* 313 Md. 701, 704, 548 A.2d 135, 137 (1988) ("As a matter of statutory construction, where the Legislature has required specified coverages in a particular category of insurance, and has provided for certain exceptions or exclusions to the required coverages, additional exclusions are generally not permitted"); *Lee v. Wheeler,* 310 Md. 233, 239, 528 A.2d 912, 915 (1987) ("we will not imply exclusions nor recognize exclusions beyond those expressly enumerated by the legislature"); *Jennings v. Gov't Employees,* 302 Md. 352, 358–359, 488 A.2d 166, 169 (1985) ("we will not insert exclusions from the required coverages beyond those expressly set forth by the Legislature"); *Nationwide Mut. Ins. v. Webb,* 291 Md. 721, 730, 436 A.2d 465, 471 (1981) ("conditions or limitations in an uninsured motorist endorsement, which provide less than the coverage required by the statute, are void"); *Pennsylvania Nat'l Mut. v. Gartelman,* 288 Md. 151, 160–161, 416 A.2d 734, 739 (1980). *Larimore v. American Ins. Co.,* 314 Md. 617, 622, 552 A.2d 889, 891 (1989); *Nationwide Mut. Ins. Co. v. USF&G,* 314 Md. 131, 141, 550 A.2d 69, 74 (1988). This is the other reason that the majority is wrong.

Noting that § 19–507(a) "statutorily mandated" the payment of PIP benefits whether or not health insurance benefits were received, even if in the form of the payment for medical

expenses arising out of an accident, we declared, "it is not our proper function to add to the statute another class of exemptions. That is a legislative function." *Dutta, supra,* 363 Md. at 553–54, 769 A.2d at 956. We were guided in reaching this conclusion by "[t]he rules of statutory construction relating to statutory provisions that create exceptions or exemptions from other statutory provisions." *Id.* In addition to the rules of construction, the Court's view that no other exceptions were intended, was reinforced by reference to § 19–513(e)[9] of the Insurance Law Article, expressly providing for an exemption for workers' compensation benefits, and *State Farm v. Insurance Commissioner,* 283 Md. 663, 392 A.2d 1114 (1978). The former demonstrated that the Legislature knows how to make exemptions from the statutorily mandated PIP payments. *Dutta, supra,* 363 Md. at 552, 769 A.2d at 955. The latter is an application of § 19–513(e); we pointed out that, in that case, the Court held that, "because of the express provisions in section 539(d) relating to workmen's compensation, [the insured] was not entitled to recover PIP benefits to the extent he had recovered workmen's compensation benefits." *Id.,* 363 Md. at 552, 769 A.2d at 955.

As in *Dutta,* the automobile insurer is statutorily mandated to pay to the named insured the PIP benefits for which the insured contracted. Neither § 19–507 nor any other statute, other than § 19–513, prescribes an exemption or exception, to this mandate. In this case, the justification for the distinction that is sought to be made from *Dutta* is that coordination, in an effort to avoid duplication, of policies is what is being done and such coordination is statutorily blessed by not only § 19–507(b)(1), but by § 15–104 and Health–General § 19–713.1. To be sure, coordination of duplicative policies is the goal and aim

---

9. Section 19–513(e) provides,

"Reduction due to workers' compensation benefits.—Benefits payable under the coverages described in §§ 19–505 and 19–509 of this subtitle shall be reduced to the extent that the recipient has recovered benefits under the workers' compensation laws of a state or the federal government for which the provider of the workers' compensation benefits had not been reimbursed."

of the insured's policy directive, as reflected in the Physician Manual and coordination of such policies is statutorily permitted. The operative term, however, is permitted; in a case in which the policies to be coordinated are automobile and health, by the express terms of § 19–507(b)(2), coordination may occur only at the election of the named insured, who also has the option to reject coordination. The Legislature, thus, by providing for coordination, has not provided an exception or exemption to § 19–507(a)'s requirement that PIP benefits be paid and, because the other coordination statutes do not address the issue, it has not enacted an exception to the insured's right to elect coordination of policies with duplicative benefits or to simply reject that option.

## V

In reaching its conclusion in the instant case, not only has the majority ignored the rule "of statutory construction relating to statutory provisions that create exceptions from other statutory provisions," it has disregarded, and refused to give effect to the clear and unambiguous language of § 19 –507. In so doing, its conclusion flies in the face of the clearly expressed and unmistakable intention of the Legislature.

The majority acknowledges that § 19–507(b)(1) addresses the situation in which the insured under an automobile insurance policy has "alternative medical, wage replacement, and hospital benefits available and thus do not require the mandatory PIP benefits." 411 Md. at 181, 983 A.2d at 97. Moreover, it recognizes that coordination may occur at the option of the insureds, but if it does not, the PIP coverage remains primary. *Id.* at 181–82, 983 A.2d at 97. Curiously, particularly in light of how much easier, not to mention the potential impact on litigation, it would have been had the Legislature simply said that the section applied only to motor vehicle insurance, the majority concludes that "[s]ection 19–507(b)'s language requiring the insured's consent to the coordination of policies and the nonduplication of benefits applies only when the insured seeks to make a collateral benefit primary to PIP coverage." *Id.* at 182, 983 A.2d at 97. For that proposition, it

cites *Maryland Auto. Insurance Fund v. Perry,* 356 Md. 668, 670, 741 A.2d 1114, 1115 (1999) ("[Section] 19 of the Insurance Article focuses on automobile liability insurance carriers and their insureds, not HMOs or other insurance carriers.") and relies on the fact that, in the Maryland Code, provisions regulating health insurers and HMOs are located in separate Articles or Titles.

The concession that, among the benefits included in the provisions of § 19–507(a)(1) are "collateral source[s] of medical, hospital, or wage continuation," is important. Clearly, the benefits to which the provision refers, because referred to as "collateral" and distinguished from those required by § 19–505, are not those ordinarily associated with automobile insurance policies. Thus, the majority and I agree that § 19–507(b)(1) addresses non-automobile insurance benefits and, thus, insurance. Subsection (b)(1), is, by its terms, "[s]ubject to Paragraph (2)." As I read § 19–507(b), therefore, coordination of the automobile policy and the non-automobile, the collateral, policy is subject to the election or rejection of the named insured. To be sure, the provision contemplates that coordination by the insurer or the insurers may occur and the named insured can not instruct an insurer that is not his insurer. It is nevertheless also true that coordination connotes cooperation and that can only occur if the automobile insurer is at the table, an impossibility if its named insured elects to reject coordination or if coordination can be done without that insurer's involvement. There also is the matter of the requirement that there be appropriate reductions in premiums. In this case, moreover, Wu is the insured of both insurers.

If the majority is correct, that an HMO or health provider can unilaterally "coordinate" [10] its policy to be secondary to

---

10. The concept of coordination envisions more than unilateral action. The Court of Special Appeals in addressing Talbot County's "legal obligation to work 'in coordination with affected municipalities' to establish a process to accommodate the [municipal] growth needs,"

PIP coverage, what, one must ask, does § 19–507(b)(2) mean? The majority answers:

> "An individual may be covered by two or more motor vehicle policies that provide PIP coverage. *See, Bishop v. State Farm Mut. Auto Ins.*, 360 Md. 225, 236, 757 A.2d 783, 786 (2000) ('A person injured in an automobile accident could be eligible for PIP benefits from two or more sources....') quoting *[MAIF v.] Perry*, 356 Md. [668] at 676, 741 A.2d [1114] at 1118; *see also* [Andrew] Janquitto, [MARYLAND MOTORVEHICLE INSURANCE (2d ed.1992)]supra, at 556 ('A person may be insured by two or more motor vehicle policies....'). In addition, § 19–507(b) sets forth the terms in which motor vehicle insurers may coordinate their policies with one another or with other insurance policies and provides the insured the right to agree to such coordination in writing or to reject such coordination. What § 19–507(b) does not do is restrict when a health insurer or HMO may attempt to coordinate its policy."

411 Md. at 185, 983 A.2d at 99.[11]  I am not persuaded.

---

defined the term "coordination." *Talbot County v. Town of Oxford*, 177 Md.App. 480, 488, 936 A.2d 374, 379 (2007). The intermediate court explained that the word "coordination:"

> "whether used as a noun, verb or adjective, has no subtle meaning. To 'coordinate' means to harmonize, work together, or bring into a common action, effort or condition." *See, Network Commerce, Inc. v. Microsoft Corp.*, 260 F.Supp.2d 1034, 1041 (W.D.Wash.2003), *affirmed* 422 F.3d 1353 (2005), *Sharp v. Fields (In re Baby W.)*, 796 N.E.2d 364, 373 (Ind.App.2003).

*Id.* at 501–02, 936 A.2d at 386–87.

**11.** The majority relies on *Smith v. Physicians Health Plan, Inc.*, 444 Mich. 743, 514 N.W.2d 150 (1994) for the proposition that "although the consumer has the choice to coordinate coverage on the no-fault side of [his or her] insurance ... [t]here is not a corresponding guarantee that the selection of an uncoordinated no-fault insurance policy will dictate the terms of whatever other insurance one might have." This case is distinguishable. The statute at issue in *Smith*, governed coordination of benefits by no-fault insurers. The provision provided, in relevant part:

> "MCL 500.3109a; MSA 24.13109(1) provides in pertinent part: An insurer providing personal protection insurance benefits shall offer,

Section 19–507  (b) can not be parsed as the majority would have us do.  As I have pointed out, *supra*, subsection (b) is applicable whenever there is coverage for both PIP and from a collateral source.  It does not require, as it could not, coordi-

---

at appropriately reduced premium rates, deductibles and exclusions, reasonably related to other health and accident coverage on the insured."

(citations omitted).

The Michigan supreme court explained that:

"there [was] nothing explicit or implicit in § 3109a to prevent enforcement of the coordination clause in the health care policy, resolution of this case is a matter of simple contract interpretation.  There is nothing in the statutory scheme to enable the plaintiff to unilaterally uncoordinate his health insurance."

*Smith*, 444 Mich. at 758–59, 514 N.W.2d 150.

Unlike the provision found in *Smith*, there is explicit language in § 19–507(b) that prevents enforcement of the coordination clause like the one found in Wu's health care policy.  We are not dealing with the same statutory scheme.  Michigan's statute does not provide a provision similar to § 19–507(b) that expressly allows the insurer to elect or reject coordination of her PIP benefits with any collateral benefits she may have.  The Michigan provision mandates the insurer to reduce premium rates, deductibles and exclusions, reasonably related to other health and accident coverage on the insured, and does not speak to an insured's option to elect or reject to coordinate benefits.  Section 19–507(b) provides for just that.

The majority also responds:

"*Dutta* . . . concerned only what § 19–507(a) requires of automobile insurers providing PIP coverage.  This Court in *Dutta*, did not address, and has not yet addressed, whether § 19–507(b) restricts or prohibits a health insurer or HMO from providing by contract that its health benefits are secondary to PIP benefits."

411 Md. at 175–76, 983 A.2d at 93–94.  In this case, it must be remembered that the policy Wu had with MAM SI contained no such provision.  Therefore, in effect, the majority is saying that a health insurer or HMO may do indirectly what it cannot do directly, that, while, under the Insurance Law, it may not be able to issue a policy mandating that PIP be paid before its coverage begins, it can effect that result by inserting such a clause in its contract with its medical providers.  If it can do that, any health insurer and HMO will be able to evade the coordination requirement of § 19–507(b)(2), including, especially, the reduction of the premiums, thus, as Wu points out, essentially negating its impact.

Such result also is the realization of the fears expressed by labor before PIP legislation was passed and with which the coordination provision of § 19–507(b)(2) was intended to deal.  It is after all the insured under both policies that is most directly affected, as he or she pays the premiums, in return for which he or she is entitled to some return.

nation, it only permits it, the ultimate election belonging to the named insured. If the majority is correct, coordination is required or at least can be forced. That approach not only reads a provision into the non-automobile coordination statutes, *Dutta, supra,* but it utterly disregards the canon of statutory construction that requires the court to read the conflicting statutes together in an attempt, and with an eye, to harmonizing them, rather than rendering any one or more of them superfluous. *United States v. Ambrose,* 403 Md. 425, 440, 942 A.2d 755 (2008) citing *Kushell v. Dep't of Natural Res.,* 385 Md. 563, 577, 870 A.2d 186, 193 (2005).

Furthermore, it is illogical to suppose that, in one statute, the General Assembly would give to insureds a right to elect or reject an insurance option and, by not expressly mentioning that right in another statute, addressing the very benefits affected in the prior statute, intend to negate that right, even when the insured under both policies is the same. That does not make sense. Just how absurd that interpretation is can be further demonstrated by recalling that one insurance company may supply both automobile and health insurance. In that event, under the majority's analysis, that insurance company could issue an automobile policy, under which its insured could reject coordination and then, or at the same time, negate that insured's exercise of the option by issuing the same insured a health policy that does not give the insured that option. It is well settled that we do not, or are not supposed to, interpret statutes to reach nonsensical or unreasonable results. As we said in *Nesbit v. Government Employees Insurance, Co.,* 382 Md. 65, 75, 854 A.2d 879, 885 (2004):

> "[W]e have held that the Court must take a 'commonsensical' approach when construing a statute. *Board of Trustees of the Maryland State Retirement and Pension Systems v. Harry R. Hughes,* 340 Md. 1, 7, 664 A.2d 1250, 1253 (1995) quoting *Frost v. State,* 336 Md. 125, 137–38, 647 A.2d 106, 112 (1994). We must seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense. *Id.*"

*See Gregg v. State,* 409 Md. 698, 716, 976 A.2d 999, 1009 (2009) ("we do not interpret legislative acts to have been done for nonsensical reasons, nor do we construe statutory language in a manner that renders a portion of the law nugatory or superfluous."); *State Farm Mut. Auto. Ins. Co. v. DeHaan,* 393 Md. 163, 170–171, 900 A.2d 208, 212 (2006).

I respectfully dissent.